LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

CYNTHIA YEE-WALLACE, ISB #6793
PETER L. WUCETICH, ISB #10557
Deputy Attorneys General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
cynthia.wallace@ag.idaho.gov
peter.wucetich@ag.idaho.gov
            Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS, a Washington corporation,<br><br>            Plaintiff,<br><br>v.<br><br>LAWRENCE G. WASDEN, et al.,<br><br>            Defendants. | Case No. 1:18-cv-00319-DCN<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Defendants submit this memorandum in opposition to the motion for preliminary

injunction filed by Plaintiff Planned Parenthood of the Great Northwest and the Hawaiian Islands

("Planned Parenthood").  This memorandum is supported by the Declarations of Marietta I.B.

Thompson, M.D. ("Thompson Decl."), Anne Lawler ("Lawler Decl."), Michelle D'Arcy-Evans

("D'Arcy-Evans Decl."), Elke Shaw-Tulloch ("Shaw-Tulloch Decl."), Debra Ransom ("Ransom

Decl."), and Cynthia Yee-Wallace ("Yee-Wallace Decl.").

## I.     INTRODUCTION

This case will decide whether the State of Idaho has a right to collect information about abnormal events that occur as a direct or indirect result of an abortion.  Idaho has been tracking only five specific abortion complications for years, and has only required physicians who perform abortions to report those complications.[1]  Until the Idaho Abortions Complication Reporting Act ("Act"), however, there were no requirements for medical practitioners *other* than physicians who performed abortions, to report abortion complications to the Idaho Bureau of Vital Statistics.  And abortion reporting has long been upheld as constitutional when a rational basis exists.

Facilities where abortions are performed, like Planned Parenthood, are not subject to State licensing or inspection requirements.[2]  However, the medical practitioners who work at such facilities are subject to the licensing and regulatory authority of their individual licensing boards, like the Idaho Board of Medicine.  The information that a medical practitioner must report under the Act provides the State with valuable information that protects public health and safety.  The information gives the State an understanding about the frequency and nature of abortion complications in Idaho.  The Act also gives the Board of Medicine information that allows it to monitor whether physicians are following the standard of care or needlessly putting patient safety at risk in the performance of abortions.[3]  This is particularly important because States may presume that women who receive an abortion are less likely to report irresponsible

---

[1] Shaw Tulloch Decl. ¶ 3, Ex. A.
[2] *See* Ransom Decl. ¶ 7.
[3] *See* Lawler Decl. ¶ 11.

practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice.

The Act requires hospitals, licensed health care facilities, and medical practitioners to file a written report with the Idaho Department of Health and Welfare ("IDHW") when practitioners come across what they believe, in their reasonable medical judgment, is a complication stemming from an abortion.  Idaho Code § 39-9504(1).  The term "complication" is defined in the Act as "an abnormal or a deviant process or event arising from the performance or completion of an abortion," and lists 37 potential conditions that can qualify.  Idaho Code § 39-9503(2)(a)-(kk).  Planned Parenthood argues that the Act is vague.  But Plaintiff's vagueness argument improperly asks the Court to ignore the qualifying phrase "an abnormal or a deviant process or event arising from the performance or completion of an abortion," rendering that language a nullity.

Planned Parenthood also argues at length about the safety of abortions, comparing them to: "colonoscopies," "plastic surgery," "dental procedures" and "adult tonsillectomies."  (Dkt. 7-5 ¶ 23.)  And Planned Parenthood argues that the Act is unconstitutional because it requires physicians to report on *abortion* complications, but does not require complication reporting with *other* medical procedures.  (*See* Dkt. 7-1 at 13-15.)  But Plaintiff is wrong.  Although undisputedly a constitutionally protected right, abortion is not like any other medical procedure, because no other procedure involves the termination of a potential life.  And the United States Supreme Court acknowledges this fact.[4]  Removing a fetus from a woman's womb is simply not comparable to removing her tonsils or having dental work done.  Planned Parenthood is not

---

[4] *Harris v. McRae*, 448 U.S. 297, 325 (1980); *see also Bellotti v. Baird*, 428 U.S. 132, 149 (1976).

likely to succeed on the merits of its claims and its motion for preliminary injunction should be denied.

## II.     BACKGROUND

The Act was passed by the Idaho House of Representatives on March 1, 2018 by a vote of 56 to 13 with one abstention, and then was passed by the Idaho State Senate on March 14, 2018 by a vote of 21 to 14.  (Yee-Wallace Decl. ¶ 7, Ex. F.)  Governor Otter signed the bill into law on March 22, 2018 and it went into effect on July 1, 2018.  (*See id.* Ex. F.)  The stated purpose of the Act is "to promote the health and safety of women by adding to the sum of medical and public health knowledge through the compilation of relevant data on all abortions performed in the state, as well as on all medical complications and maternal deaths resulting from these abortions."  Idaho Code § 39-9502(2).

The Act specifies what information the medical practitioner should attempt to ascertain and include in the report.  Idaho Code § 39-9504(2).  It also specifies that certain information should not be included in the report, such as the patient's name, social security number, and other common identifiers or information that would make it possible to identify her.  Idaho Code § 39-9504(3).

The Act further specifies that the reports are not to be deemed public records and are to remain confidential.  Idaho Code § 39-9504(6).  In fact, the Act makes it a misdemeanor to willfully disclose information included in the reports.  Idaho Code § 39-9506(2).  IDHW is required to use the information from the confidential reports to prepare a comprehensive annual statistical report for the Legislature.  Idaho Code § 39-9504(4).  The aggregate data from these reports is also to be made available to the public.  Idaho Code § 39-9504(5).  However, no statistical data that may reveal the identity of the patient is to be maintained by IDHW.  Idaho

Code § 39-9504(8).  Copies of the reports under the Act must be made available to the Board of Medicine.  Idaho Code § 39-9504(10).

There are non-criminal penalties for willfully failing to report complications that a medical practitioner, in his or her reasonable medical judgment, believes is a direct or indirect result of an abortion.  *See* Idaho Code § 39-9506(3).  More specifically, if an individual willfully fails to file a report required under the Act they are: (1) guilty of unprofessional conduct and thereby subject to discipline in accordance with his or her license, and (2) subject to a civil fine of $500 for each failure to report.[5]  *Id*.  The Act does include some criminal penalties.  More specifically, it provides that it is a misdemeanor for a person to willfully disclose information to IDHW that they know to be false, and for a person to willfully disclose information from the confidential reports.  Idaho Code § 39-9506(1) and (2).  However, there are no other criminal penalties under the Act.

For years, Idaho has required attending physicians who perform abortions to report complications to IDHW by the fifteenth day after the end of each month.  *See* Idaho Code § 39-261(a).  The list of complications that must be reported include five specific things: (1) hemorrhage; (2) infection; (3) uterine perforation; (4) cervical laceration; and (5) retained products, with a blank for "Other."  (Dkt. 7-6 ¶ 11, Ex. A.)  However, prior to the Act there were

---

[5] Planned Parenthood claims that the Act has criminal penalties for failing to properly report an abortion complication.  For instance, in its moving papers, Planned Parenthood states as follows:

> Providers who fail to file a report that the defendants decide was required under Idaho Code § 39-9504 can lose their professional license and livelihood.  <u>They can not only be fined civilly, but also *prosecuted criminally and jailed*</u>.  I.C. §39-9506(3).

(Dkt. 7-1 at 5 (emphasis added).)  However, the cited Idaho Code subsection (§ 39-9506(3)) does not provide for any criminal penalties.

no reporting requirements to IDHW for abortion complications from any other medical

practitioner who provides treatment for an abortion complication.  The Act changes that.

### III.    STANDARD

"Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to

succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public

interest."  *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citation omitted).  The burden of

persuasion remains with the party seeking preliminary injunction relief.  *West Point-Pepperell,*

*Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir. 1982) (citation omitted).  Because a preliminary

injunction is an extraordinary remedy, courts require the movant to carry its burden of persuasion

by a "clear showing."  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted);

*Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (citation omitted).

### IV.    DISCUSSION

**A.  Planned Parenthood is not likely to succeed on the merits of its due process clause
   claim and its request for a preliminary injunction should be denied.**

   1.  **The Court is duty bound to avoid construing the statute as Planned
       Parenthood advocates.**

A statute is unconstitutionally vague if it "fails to provide a person of ordinary

intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008)

(citations omitted).  The void for vagueness doctrine "addresses at least two connected but

discrete due process concerns: first, that regulated parties should know what is required of them

so they may act accordingly; second, precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way."  *Yamada v. Snipes*, 786 F.3d

1182, 1187 (9th Cir. 2015) (citation omitted).   "Nevertheless, even in the strictest sense, due process does not require 'impossible standards' of clarity."  *Info. Providers' Coal. for Def. of the First Amendment v. F.C.C.*, 928 F.2d 866, 874 (9th Cir. 1991) (citing *Kolender v. Lawson,* 461 U.S. 352, 361 (1983).  "[W]e can never expect mathematical certainty from our language." *Id.* (alteration in original) (quoting *Grayned v. City of Rockford*, 408 U.S. 408, 110).

In making this judgment, courts provide "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (footnote omitted).  With respect to penal statutes, to avoid being unconstitutionally vague, the statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *United States v. Schales*, 546 F.3d 965, 972 (9th Cir. 2008) (citation omitted).

Planned Parenthood attacks the 37 complications listed in Idaho Code § 39-9503(2) as "constitutionally vague."  (*See* Dkt. 7-1 at 8.)  That statute states, in relevant part, "[c]omplication" *means an abnormal or a deviant process or event arising from the performance or completion of an abortion*, as follows:" and then lists 37 items that can qualify as a complication.  Idaho Code § 39-9503(2) (emphasis added).  Plaintiff strategically focuses the Court's attention *solely* on the 37 complications listed under subparts (a) through (kk) of Idaho Code § 39-9503(2) and then asks the Court to deem the entire Act constitutionally vague.  (Dkt. 7-1 at 8-13.)  In doing so, Plaintiff's entire vagueness argument hinges on the Court completely ignoring the qualifying phrase immediately following the word "complication" which "means an abnormal or a deviant process or event arising from

the performance or completion of an abortion," as surplusage.  But the Court is duty bound to avoid the construction Planned Parenthood offers.

The elementary principle of statutory construction requires the Court "to give effect, if possible, to every clause and word of a statute." *King v. Burwell*, 135 S. Ct. 2480, 2498 (2015) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152 (1883)).  Lawmakers do not "tend to use terms that have no operation at all," and the rule against treating words as a nullity "is as close to absolute as interpretive principles get."  *Id*. (citing *Marbury v. Madison*, 1 Cranch 137, 174, 2 L.Ed. 60 (1803)); *see also N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017); *and Williams v. Taylor,* 529 U.S. 362, 404 (2000).  Draining and erasing a qualifying phrase in a statute violates the "fundamental canon of statutory construction that a statute should not be construed so as to render any of its provisions mere surplusage."  *See Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1048 (9th Cir. 2014) (citations omitted).  "The cardinal principle of statutory construction is to save and not to destroy.  It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section...." *United States v. Menasche,* 348 U.S. 528, 538–39 (1955) (citations omitted) (internal quotation marks omitted).

Contrary to the picture that Planned Parenthood paints, the Act does not require medical practitioners to report "normal side effects that are routine, minor, and expected in connection with an abortion" such as "bleeding" or "blood clots."  (Dkt. 7-1 at 8.)  The Act also does not require Planned Parenthood's physicians to "report anything and everything on the list" of 37 items in Idaho Code § 39-9503(2).  (*See* Dkt. 8-2 ¶ 31.)  And the Act does not "strip[]" Plaintiff's physicians from using their medical judgment to determine what is, and is not, a complication under the Act.  (*Id.* ¶ 38.)  Rather, the Act requires medical practitioners to report such things as "heavy or excessive bleeding" and "blood clots" when—and *only* when—those

conditions are "an abnormal or a deviant process or event arising from the performance or completion of an abortion."  Idaho Code § 39-9503(2)(e), (g).  And Planned Parenthood's medical practitioners only have to report heavy or excessive bleeding, for example, when its practitioners are in fact the ones who treat a woman for such complication.  In that case, if the attending practitioner has reason to believe in his or her "reasonable medical judgment" that the excessive bleeding directly or indirectly results from an abortion, it must be reported.  Idaho Code § 39-9504.

To bolster its vagueness argument, Plaintiff attempts to marry Idaho's statute here to an Indiana statute that Planned Parenthood of Indiana and Kentucky enjoined earlier this year: Indiana Code § 16-34-2-4.7.  Plaintiff was careful to attach the Indiana court's decision to its Preliminary Injunction Memorandum (Dkt. 7-1) for this Court to review, but also just as carefully did *not* provide the Court with a copy of the Indiana statute *or* the brief filed by Planned Parenthood in Indiana.  (*See* Yee-Wallace Decl. ¶¶ 5-6; Exs. D and E.)  Even a cursory review of these two statutes quickly reveals how different they are.  Indiana defined "abortion complication" as "*any adverse physical or psychological condition* arising from the induction or performance of an abortion," and provided a *non-exclusive* list of 26 examples of the types of conditions that this term "includes."  Ind. Code § 16-34-2-4.7 (emphasis added).  The court that enjoined this law found the phrase "any adverse physical or psychological condition" vague and noted that, because the term "includes" was inserted before the list of conditions, that list could not be construed as an exclusive list.  (Dkt. 7-2 at 12 ¶¶ 18-22.)

In contrast, Idaho's statute defines "complication" as "an abnormal or a deviant process or event arising from the performance or completion of an abortion," and then provides an *exclusive* list of the conditions that qualify for reporting.  Idaho Code § 39-9503(2).  Noticeably

absent from the Act is the term "includes" and, in light of the absence of that term, the list set

forth therein must be interpreted to be exclusive.  *Local 1494 of Int'l Ass'n of Firefighters v. City*

*of Coeur d'Alene*, 99 Idaho 630, 639-640, 589 P.2d 1346, 1355-56 (1978) ("It is a universally

recognized rule of the construction that, where a constitution or statute specifies certain things,

the designation of such things excludes all others." (Citations omitted.)).[6]  And, most notably,

Planned Parenthood of Indiana did not ask the Indiana court to ignore the phrase following the

word "complication," like it does here.  In the Indiana case, Planned Parenthood gave effect to

every word of that statute and pointed out over and over again how the non-qualifying phrase

"any adverse physical or psychological condition" made the statute vague.  Here, in order to

*create* a vagueness argument, Planned Parenthood does the exact *opposite* with Idaho's statute.[7]

Planned Parenthood does not argue that the qualifying phrase "abnormal or a deviant

process or event resulting from the performance or completion of abortion" is vague.  It's not.

Abnormal means "deviating from the normal or average" (Merriam-Webster's Collegiate

Dictionary 45 (19th ed. 1989)) or "not normal; differing in any way from the usual state,

structure, condition, or rule" (Steadman's Med. Dictionary 3 (27th ed. 2000)).  And deviant

means "straying or deviating especially from an accepted norm" (Merriam-Webster's Collegiate

---

[6] Given that the list of conditions in the Indiana Law was non-exclusive, the court did not sever the conditions which it found to be vague.  (Dkt. 7-2 at 14 ¶¶ 27-28.)  Here, since the list is exclusive, if any conditions are found to be vague, they should be severed pursuant to Idaho Code § 39-9509, which expressly provides for severability.

[7] The Indiana law also requires medical practitioners to report each instance in which they treated a patient who suffered from an "abortion complication," and provides that "[e]ach failure to report an abortion complication as required under this section is a Class B misdemeanor."  Ind. Code § 16-34-2-4.7(b) & (j).  In contrast, Idaho's statute requires medical practitioners to report complications only if, through the exercise of their reasonable medical judgment, they believe a qualifying condition resulted from an abortion, and there are no criminal penalties associated with failing to report.

Dictionary, *supra*, at 347) or "denoting or indicative of a deviation" (Steadman's Med. Dictionary, *supra*, at 486).  When the qualifying phrase is properly applied, the definition of "complication" *on its face* does not require medical practitioners to report things that are "routine, minor, and expected." (Dkt. 7-1 at 8).  The Board of Medicine understands how to enforce violations under the Act, and medical practitioners understand and are amply on notice of what is required of them under the Act.  (Lawler Decl. ¶ 8; Thompson Decl. ¶ 9; D'Arcy-Evans Decl. ¶ 5.)  Had the Idaho Legislature wanted to define a "complication" to mean *only* the 37 items listed in Idaho Code § 39-9503(2), it could have.  The definition could have been drafted to say, "Complication" means: (a) uterine perforation or injury to the uterus: (b) injury or damage to any organ inside the body…etc., but it wasn't.

Moreover, Planned Parenthood knows precisely when things such as "heavy or excessive bleeding," "blood clots," "infection," an "allergic reaction," "death," or "psychological or emotional conditions" are abnormal or deviant in connection with the performance or completion of an abortion.  *See* Idaho Code § 39-9503(d), (e), (g), (dd), (ii), (jj).  Planned Parenthood requires its physicians to follow the medical standards and guidelines adopted by the Planned Parenthood Federation of America ("PPFA").  (Yee-Wallace Decl. ¶ 2, Ex. A at 6 ¶ 15.)  PPFA counsels its patients about the possible risks and complications from abortions.  (*See id*., Ex. A at 8-9 ¶ 22.)  With respect to "the abortion pill" a/k/a medication abortions, PPFA's website states:

Serious complications are really rare, but can happen. These include:

- the abortion pills don't work and the pregnancy doesn't end

- some of the pregnancy tissue is left in your uterus

- blood clots in your uterus

- bleeding too much or too long

- infection

- allergic reaction to one of the medicines

These problems aren't common.  And if they do happen, they're usually easy to take care of with medication or other treatments.

In extremely rare cases, some complications can be very serious or even life threatening.  Call your doctor or health care center right away if you have:

- heavy bleeding from your vagina that soaks through more than 2 maxi pads in an hour, for 2 or more hours in a row

- passing large clots (bigger than a lemon) for more than 2 hours

- belly pain or cramps that don't get better with pain medication

- a fever of 100.4 or higher more than 24 hours after taking misoprostol

- weakness, nausea, vomiting, and/or diarrhea that lasts more than 24 hours after taking the misoprostol

(Yee-Wallace Decl. Ex. B.)  PPFA counsels its medication abortion patients to "[c]all your doctor or nurse right away if you have any of those symptoms.  Serious problems can cause death in the most rare cases, but abortion is typically very safe." (*Id.*)  PPFA similarly acknowledges that "long-term emotional problems" can occur with medication abortions.  PPFA states that, "[s]erious, long-term emotional problems after an abortion are rare, and about as uncommon as they are after giving birth." (*Id.*)  "They are more likely to happen in people who have to end a pregnancy because of health reasons, people who do not have support around their decision to have an abortion, or people who have a history of mental health problems." (*Id.*)  Planned Parenthood acknowledges at least two "emotional conditions" most common after an abortion: guilt and sadness.  (Dkt. 7-5 ¶ 43 (citation omitted).)

With respect to surgical abortions, *i.e.*, using either vacuum aspiration or dilation and evacuation to remove a fetus from the uterus, PPFA also counsels its patients on the risks and

complications of those types of abortions.  (*See* Yee-Wallace Decl. Ex. A at 8-9 ¶ 22.)  PPFA's

website states that in-clinic abortions a/k/a surgical abortions are medical procedures that carry

risks and advises its patients when something becomes abnormal or deviant:

> The chances of problems get higher the later you get the abortion, and if you have
> sedation or general anesthesia.

> Serious complications are rare, but can happen.  These include:

> - the abortion doesn't work and the pregnancy doesn't end

> - some of the pregnancy tissue is left in your uterus

> - blood clots in your uterus

> - very heavy bleeding

> - infection

> - injury to your cervix, uterus or other organs

> - allergic reaction to medication

> * * *

> In extremely rare cases, some complications can be very serious or even life-
> threatening.  Call your doctor right away if you have:

> - heavy bleeding from your vagina that soaks through more than 2 maxi
>   pads in an hour, for 2 or more hours in a row

> - severe pain or discomfort in your belly that medication doesn't help

> - a fever of 100.4 or higher

(Yee-Wallace Decl. Ex. C.)

Moreover, Planned Parenthood admittedly already screens its patients for many of the

items that are either tied to or listed in Idaho Code § 39-9503 in order to determine if the patient

is medically eligible for an abortion, and it documents the results of its screening.  (*See id.*, Ex. A

at 6 ¶¶ 18.a, 18.b, 18.d.)  Planned Parenthood determines the medical eligibility of each of its patients who seek a medication abortion in Idaho by screening them for: (a) unwillingness to have surgical follow-up if medications do not succeed in completing the abortion; (b) inability or unwillingness to have a follow-up visit to confirm the pregnancy was terminated; (c) lack of access to a telephone or emergency medical care and transportation; (d) a condition that would preclude aspiration procedure in an outpatient setting; or (e) lack of support at home; (f) residing more than one hour from emergency care.  (*Id.*, Ex. A at 7-8 ¶ 19).  "If a patient falls into any of these categories, Planned Parenthood does not proceed with a medication abortion."  (*Id.*) Scheduling and attending a follow-up visit after a medication abortion is a necessary part of the medication abortion process in order to "confirm the pregnancy is terminated."  (*Id.*, Ex. A at 7-8 ¶ 19, 10 ¶ 26.)  Thus, if a woman fails to follow-up and confirm that the pregnancy is terminated, such would be abnormal or deviant with respect to the completion of a medication abortion.  (*See id.*, Ex. A at 7-8 ¶ 19, 10 ¶ 26.)  Patients are screened for their willingness and ability to attend a follow-up visit and if they are unwilling or unable to do so, Planned Parenthood will not perform the abortion.  (*Id.*, Ex. A at 7-8 ¶ 19.)  In fact, Planned Parenthood itself tracks the percentage of women who return for follow-up visits at Planned Parenthood.  (*See id.*, Ex. A at 10 ¶ 27.)

In light of the foregoing, and when the qualifying phrase "an abnormal or deviant process or event arising from the performance or completion of an abortion" is applied to the 37 items listed in Idaho Code § 39-9305(2), Planned Parenthood's vagueness argument collapses. Of the 37 items listed in that statute, Planned Parenthood either already counsels its patients on the 11 items listed in subsections (a), (b), (c), (d), (e), (g), (i), (j), (dd), (ii), (jj); screens for at least three items listed in subsections (k), (ff), (gg); acknowledges that at least two other items are already tracked as complications for abortion, in subsections (f) and (h); and counsels that if

the three items in subsections (l), (m), and (n) occur, women should call their doctor right away because they can lead to serious complications that are life-threatening.  (Yee-Wallace Decl. Exs. B and C; Dkt. 8-2 ¶ 24.)  In light of this, one has to question the sincerity of Planned Parenthood's claim that the Act requires the reporting of "extensive amounts of irrelevant information."  (Dkt. 7-5 ¶ 30.)  And no good faith argument can be made that Planned Parenthood's physicians would be confused or unsure about how to comply with reporting these items nor when these items have reached a point that they are abnormal or deviant with respect to the performance of completion of an abortion.  The remaining 18 items listed in Idaho Code § 39-9503(2)(o) through (cc) and (ee), (hh), and (kk) are not vague or confusing.  Instead, Planned Parenthood merely disagrees that such items should be considered under the Act.

In sum, the Court cannot accept Planned Parenthood's interpretation of Idaho Code § 39-9503(2) without violating a bedrock principle of statutory construction that requires this Court to find meaning to the clause, "an abnormal or a deviant process or event arising from the performance or completion of an abortion."  Idaho Code § 39-9503(2); *and Estate of Reynolds v. Martin*, 985 F.2d 470, 473 (9th Cir. 1993).  That qualifying phrase is integrally related to the 37 items listed in that statute and effectuates the words "reasonable medical judgment" under Idaho Code § 39-9504.  When that clause is applied in the context of the 37 items that can qualify as complications, Plaintiff's vagueness argument fails.

## 2. <u>The Act is not unconstitutionally vague simply because Plaintiff disagrees with the definitions adopted by the Idaho Legislature.</u>

It is clear that Plaintiff disagrees with the Idaho Legislature's "complication" definition in Idaho Code § 39-9503(2).  Plaintiff complains at length that some of the 37 items listed in that statute "almost never result from an abortion" or "are not possible abortion complications" or

"are not associated with abortion at all." (Dkt. 7-1 at 9, 10.)  Planned Parenthood makes these arguments—not because the statute is vague—but because it simply does not want to require its practitioners to report the items that the Legislature adopted in the Act.  (*See* Dkt. 7-1 at 8-10.) But the statutory definition in this case cannot be judicially invalidated or changed simply because a litigant disagrees with it.  "Statutory definitions control the meaning of statutory words…in the usual case." *Burgess v. United States*, 553 U.S. 124, 129–30 (2008) (alteration in original) (citations omitted).  "When a statute includes an explicit definition [the Court] must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (citations omitted).  Here, even though Planned Parenthood would have picked a different definition for the word "complication," it and the Court are bound by the one chosen by the Idaho Legislature.  This is true even if the items that can qualify as a "complication" are common complications from abortion, or merely symptoms of a complication.

Moreover, if it is true that some of the items listed in Idaho Code § 39-9503(2) almost never occur or are not possible, then Planned Parenthood need not worry about what it claims are "serious" and "significant" burdens associated with this reporting requirement.  If an item is *not* an abnormal or deviant process or event *arising from* the performance or completion of an abortion—and if in the medical practitioner's reasonable medical judgment he or she determines that the item is not a *direct or indirect result of an abortion*—then it need not be reported.

3. **The phrase "indirect result of an abortion" in Idaho Code § 39-9504 is not unconstitutionally vague nor is the lack of a temporal limitation.**

Planned Parenthood makes a half-hearted argument that requiring medical practitioners to report complications that are a direct or indirect result of an abortion makes Idaho Code § 39-

9504 unconstitutional because the phrase "indirect result of an abortion" is vague.  (Dkt. 7-1 at 11.)  The phrase is not vague on its face, especially when read in context with the entire Act. Given their ordinary meanings, an "indirect result of an abortion" means not a direct consequence of an abortion.[8]  A medical practitioner who finds that an item listed in Idaho Code § 39- 9503(2) has become an abnormal or deviant process or event arising from an abortion has already exercised his or her medical judgment to make that call.  Using the phrase "indirect result of an abortion" in Idaho Code § 39-9504 simply ensures that all such abnormal or deviant processes or events arising from an abortion are reported when discovered.  Thus, once a medical practitioner determines that there has been a "complication" under the Act, it must be reported.

Moreover, the lack of a temporal limitation within which a practitioner must diagnose a complication does not render the Act vague.  The vast majority of complications stemming from abortions are likely to manifest themselves in close temporal proximity to the abortion procedure or process.  (Thompson Decl. ¶ 12; D'Arcy-Evans Decl. ¶ 7.)  And it is unlikely that a patient who received an abortion will seek treatment for or die from an abortion that took place long ago.  (Thompson Decl. ¶ 12.)  The Act is not unconstitutionally vague, Planned Parenthood is not likely to succeed on the merits of its claims, and its motion should be denied.

---

[8] "Indirect" is defined as "not direct" (Merriam Webster's Collegiate Dictionary, *supra*, at 614) and "result" is defined as "to proceed or arise as a consequence, effect, or conclusion" (*id.* at 1006).  And, courts have held that the word "indirect" is not unconstitutionally vague in a number of other settings. *See Alaska Right to Life Comm v. Miles*, 441 F.3d 773, 783 (9th Cir. 2006) ("'Indirectly' is an easily understood word in common English usage.  In the context in which it is used, it is neither vague nor difficult to understand."); *see also Human Life of Wash., Inc. v. Brumsickle*, No. C08-0590-JCC, 2009 WL 62144 at *25 (W.D. Wash. Jan. 8, 2009).

**B. Planned Parenthood is not likely to succeed on the merits of its equal protection claim and injunctive relief should be denied.**

The Equal Protection Clause of the Fourteenth Amendment "confers no substantive rights and creates no substantive liberties." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 59 (1973) (footnote omitted). "The function of the Equal Protection Clause, rather, is to simply measure the validity of classifications created by state laws." *Id.* "And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious." *Id.* at 60 (citation omitted). States are afforded "wide scope of discretion in enacting laws which affect some groups of citizens differently than others." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961). "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *Id.*

Suspect classifications include race, religion, alienage, and national origin. *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). In addition, the United States Supreme Court has recognized that quasi-suspect classifications based on sex and illegitimacy also receive some degree of heightened scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citations omitted). In contrast, hospitals, licensed health care facilities, and medical practitioners are not a suspect class under the Equal Protection Clause of the Fourteenth Amendment. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 547 (9th Cir. 2004) ("For the same reasons that abortion providers are not a suspect class, we hold that those who provide larger numbers of abortions are not a suspect class"); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (psychoanalysts are not a suspect class); *see also Denney v. DEA*, 508 F. Supp. 2d 815, 836-37

(E.D. Cal. 2007) (physicians who support the medical use of cannabis are not a class requiring special protection under 42 U.S.C. § 1985(3)).  In addition, the Act does not distinguish between abortion providers and other health care providers.  *See* Idaho Code § 39-9504.  Instead, it creates a reporting requirement for all "medical practitioner[s]."  *Id*.

Given that no fundamental right or suspect classification is implicated by the Act, it is subject to rational basis review.  "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (citations omitted) (internal quotation marks omitted).  "Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."  *Id.* (citation omitted) (internal quotation marks omitted).  "For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."  *Id.* at 319-20 (citations omitted).  "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Id.* at 320 (citations omitted).  "Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification."  *Id.* (citations omitted) (internal quotation marks omitted).  Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* (citations omitted) (internal quotation marks omitted).

"A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification."  *Id.* (citations omitted).  "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or

empirical data." *Id.* (alteration in original) (citations omitted).  "A statute is presumed constitutional and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.* at 320-21 (citations omitted) (internal quotation marks omitted).  "Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between the means and ends." *Id.*  "A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Id.* (citations omitted) (internal quotation marks omitted).[9]

Planned Parenthood argues that medical practitioners are discriminated against in violation of the Equal Protection Clause because they are required to report complications from abortions, but do not have to report complications for childbirth or other medical procedures. (Dkt. 7-1 at 15.)  In other words, Planned Parenthood claims that medical practitioners should be free from having to report on abortion complications.  Period.  And if medical practitioners *are* required to report on abortion complications, according to Plaintiff, the only way that the Act can pass constitutional muster under the Equal Protection Clause is for the State to require complication reporting for all other medical procedures, like childbirth.  (*Id.*)  Plaintiff speculates

---

[9] "States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" *Minn. V. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (citations omitted) (internal quotation marks omitted).  "Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'" *Id.* (alteration in original) (citation omitted).  "Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Id.*

about a host of reasons why the Act lacks a rational basis: (1) the Idaho Legislature was motivated by "animus" when it passed the Act (*id.* at 2, 14); (2) the Act will collect inaccurate, useless, and unusable information (*id.* at 1-2, 16); (3) the Act will not facilitate reliable scientific studies or research (*id.* at 16); and (4) the reports from the Act will confuse women about abortions (*id.* at 16-17).  But Plaintiff's arguments go too far.[10]

The United States Supreme Court has acknowledged that "[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life."  *Harris v. McRae*, 448 U.S. 297, 325 (1980); *see also Bellotti v. Baird*, 428 U.S. 132, 149 (1976) ("not all distinction between abortion and other procedures is forbidden").  Plaintiff stresses how safe abortions are and compares them to childbirth, colonoscopies, plastic surgery, dental procedures, and adult tonsillectomies.  (Dkt. 7-5 ¶ 23.)  But none of those procedures involve the termination of a potential life and the State has a recognized interest in protecting the health of women.  *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) ("the state may … protect the health and safety of a woman seeking an abortion"); *Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 428 (1983) (overruled on other grounds by *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992)) (the state "has a legitimate concern with the health of women who undergo abortions").  And abortion "[r]ecordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible."  *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 80 (1976).

---

[10] The State already requires physicians to report a number of things such as: death, stillbirths, treatment of diseases, positive test results for HIV, treatment of cancer, and other diseases (Yee-Wallace Decl. ¶ 9.)

Moreover, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970) (citation omitted); *Ry. Express Agency v. New York*, 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." (Citation omitted).).

Here, the Act rationally advances legitimate State interests in tracking data regarding abortion complications in Idaho and will protect public health and safety.  (Yee-Wallace Decl. Ex. H. at 3; D'Arcy-Evans Decl. ¶ 8.)  "[A] State might find or presume that women who obtain abortion services are less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice." *Tuscon Woman's Clinic*, 379 F.3d at 545.  "A State might look to the history of illegal, unsafe abortions in this country and determine that women seeking abortions are particularly vulnerable to exploitation."  *Id*.  As was noted in the legislative history of HB 638, the data from the Act will "give public health officials additional information to consider in decision making regarding underserved populations, problematic providers, and problematic procedures."  (Yee-Wallace Decl. Ex. H. at 3.)

Planned Parenthood's facilities in Idaho are not subject to State licensing or inspection requirements.  (Ransom Decl. ¶ 7.)  Neither are other physician offices where abortions may be performed.  (*Id*. ¶¶ 4, 5.)  The licensed professionals who work at facilities where abortions are performed are, however, subject to regulation and monitoring by licensing boards, such as the Idaho Board of Medicine.  (*Id*. ¶ 6; Lawler Decl. ¶ 3.)  The reports filed under the Act must be made available to the Board of Medicine, which will aid the Board in regulating and monitoring physicians.  (Lawler Decl. ¶ 11.)  If such reports contain information indicating that a physician

may not be following the standard of care or is potentially putting patient safety at risk, the Board can mitigate this risk by instituting an investigation and disciplining a physician for any violations under Idaho's Medical Practice Act (Idaho Code §§ 54-1801 *et seq.*).  (*Id.*)  This assures public health and safety by "preventing possible future acts by that physician that do not conform to the appropriate standard of care and by educating the physician about how to improve his or her practice to meet the appropriate standard of care in all cases."  (*Id.*)  And although Planned Parenthood may require *its* physicians to follow the medical standards and guidelines adopted by the PPFA.  (*See* Yee-Wallace Decl. Ex. A ¶ 15.)  Other facilities where abortions are performed might not self-regulate, making the Board of Medicine's monitoring and regulation role that much more important in protecting the public.

If a physician does not follow the standard of care when performing abortions, it can harm the public or lead to some of the very complications listed in Idaho Code § 39-9503(2). (Lawler Decl. ¶ 12; Thompson Decl. ¶ 14).  For example, infections seen in multiple patients who receive abortions from a particular physician may indicate that the particular physician is deviating from the standard of care.  (Lawler Decl. ¶ 12; Thompson Decl. ¶ 14).  And a failure to properly screen a patient could lead to an increased risk of complications such as death, life-threatening anemia, heart failure, infection, or other end organ damage.  (Thompson Decl. ¶ 14.) Examples from around the country where physicians are alleged to have needlessly put women's health at risk or have violated the standard of care in the performance of abortions bear this out. (Yee-Wallace Decl. ¶ 8, Ex. G.)  Just a few examples of allegations that have been asserted against abortions providers in other states include: (1) patients being monitored in recovery by untrained, unlicensed staff; (2) failing to use an ultrasound during an abortion procedure; (3) illegally delivering live babies and delivering babies beyond the point of viability; (4) spreading

venereal diseases through infected instruments; (5) failing to evaluate or examine the patient or the age of the fetus; and (6) death of the patient.  (Yee-Wallace Decl. ¶ 8 *and* Ex. G.)

The Act provides information about the frequency and nature of abortions, allows the Board of Medicine to monitor how often complications are occurring, with what procedures or processes, with which physicians, at what facilities, and at what stage they are occurring.  (*Id*.; Thompson Decl. ¶ 13.)  This information can and will be used to protect the health and safety of Idaho patients who receive abortions.  The Act does not violate the Equal Protection Clause and Plaintiff's motion for preliminary injunction should be denied.

Finally, there is no evidence that the law was motivated by animus against abortion providers.  While "the government need not be neutral between abortion providers and other medical providers," "[a]s long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently." *Planned Parenthood of Ind., Inc. v. Comm'n of Ind. State Dep't of Health*, 699 F.3d 962, 988 (7th Cir. 2012).  Here, the Act imposes reporting requirements on all medical practioners, not just abortion providers.  And the only purported evidence of animus that Planned Parenthood points to is a brief statement by one state senator who opposed the bill, conveying his opinion that the criminal and civil penalties would not be tolerated if this law pertained to any other topic.  (Dkt. 7-1 at 15-16.)  However, one senator's opinion regarding the appropriateness of the penalties for *willfully* violating the Act is hardly enough to establish that this law, which does not single out abortion providers or create any burden on a woman's right to obtain an abortion, was motivated by animus.

**C. The privacy protections in the Act are not made null and void by the Public Records Act.**

The Act protects the privacy of both patients reporting abortion complications and the practitioners submitting reports about them.  With respect to the patients, the Act requires that personal identifying information such as name, social security, and driver's license number, among other possible identifiers, be excluded from the reports.  Idaho Code § 39-9504(3).  More specifically, § 39-9504(3) provides as follows:

> (3)  Reports required under this section shall not contain:
>> (a)  The name of the woman;
>> (b)  Common Identifiers such as the woman's social security number or motor vehicle operator's license number; or
>> (c)  Other information or identifiers that would make it possible to identify, in any manner or under any circumstances, a woman who has obtained an abortion and subsequently suffered an abortion-related complication.

In addition, the Act expressly calls for the reports submitted by practitioners to not be deemed public records and to be kept confidential.  Idaho Code § 39-9504(6).  In particular, § 39-9504(6) provides in pertinent part as follows:  "Reports filed pursuant to this section *shall not be deemed public records and shall remain confidential*, except that disclosure may be made to law enforcement officials upon an order of a court after application and a showing of good cause." (emphasis added).  Also, there are multiple provisions that aim to ensure that the patient's identity will not be disclosed.  For instance, § 39-9504(8) provides that "[s]tatistical information that may reveal the identity of a woman obtaining or seeking to obtain an abortion shall not be maintained by the department," and § 39-9504(9) provides that IDHW is not to disclose the reports to outsiders in a manner that would identify the woman who is the subject of such report.  Finally, the Act makes it a crime to willfully disclose information contained in the reports.  Idaho Code § 39-9506.  In particular, § 39-9506(2) provides: "Any person who willfully discloses any

information obtained from reports filed pursuant to this chapter, other than the disclosure authorized by this chapter or otherwise authorized by law, is guilty of a misdemeanor."

While Planned Parenthood acknowledges the Act contains express privacy protections, it claims they are made null and void by Idaho Code § 74-122, which is part of the Idaho Public Records Act.  However, the Public Records Act provides that the records that are exempt from disclosure include "[a]ny public record exempt from disclosure by federal or *state law* or federal regulations to the extent specifically provided for by such law or regulation."  Idaho Code § 74-104(1) (emphasis added).  Since a state law—the Act—specifically provides that the reports are not public records and are to remain confidential, they would be exempt from disclosure under section 74-104(1) of the Public Records Act.

Moreover, even if that were not the case and there was a conflict between the Act and the Public Records Act regarding whether the reports were exempt from public records act requests, two canons of statutory construction establish that the Act's directives govern.  The first such canon provides that, "[t]o the extent of a conflict between an earlier and later statute, the more recent expression of legislative intent prevails."  *State of Idaho v. Betterton*, 127 Idaho 562, 564, 903 P.2d 151, 153 (Idaho Ct. App. 1995) (citation omitted); *State of Idaho v. Gamino*, 148 Idaho 827, 829, 230 P.3d 437, 439 (2010).  Since the Act is the more recent statute as it was enacted in 2018 and the Public Records Act section at issue was enacted in 2015, the Act's directive that the reports shall not be deemed public records and shall remain confidential governs.  The second such canon provides that "[w]here two statutes deal with the same subject matter, the more specific will prevail."  *Betterton*, 127 Idaho at 564, 903 P.2d at 153 (citation omitted).  Here, with respect to the treatment of the reports, the Act is the more specific of the two statutes and thus it must prevail.

Furthermore, the Legislature that enacted the Act was free to amend, ignore, or repeal, either expressly or by implication, laws passed by prior legislatures.  Indeed, this is clear from *Manigault v. Springs*, 199 U.S. 473 (1905), where the United States Supreme Court found that a law passed by the South Carolina legislature which required 60 days notice before certain laws could be passed was not binding on a subsequent legislature.  The Supreme Court noted that "[a]s this is not a constitutional provision, but a general law enacted by the legislature, it may be repealed, amended, or disregarded by the legislature which enacted it." *Id*. at 487.  "[I]t is not binding upon any subsequent legislature, nor does a noncompliance with it impair or nullify the provisions of an act passed without the requirement of such notice." *Id*.; *see also Peterson v. U.S. Dep't of Interior*, 899 F.2d 799, 808 (9th Cir. 1990) (upholding congressional alteration of previously enacted government contract, recognizing "the fundamental principle that Congress always has the power to amend, repeal or ignore legislation passed by earlier congresses"); *Sierra Club v. Froehlke*, 816 F.2d 205, 215 (5th Cir. 1987) ("Congress may repeal, amend or ignore any statute it has enacted."); *Opinion of the Justices*, 673 A.2d 693, 695-96 (Maine 1996) ("This bill, if enacted, will be on equal footing with every other law passed by the Legislature: subsequent sessions of the Legislature may choose to follow it, or they may choose to repeal it, either expressly or by implication.  To read this statute as binding upon future Legislatures is to read it as an attempt to amend the Constitution … through improper means.").

Based on the foregoing, it is clear that no provision in the Public Records Act nullifies the clear and express directives in the Act that (1) patient identifying information be excluded from reports; (2) reports not be deemed public records; and (3) reports remain confidential.  *See* Idaho Code § 39-9504(3).  And both State agencies that will receive reports filed under the Act will comply with its confidentiality provisions. (Lawler Decl. ¶ 7; Shaw-Tulloch Decl. ¶ 2.)

**D. Planned Parenthood has failed to meet its burden establishing a realistic threat of irreparable harm.**

Planned Parenthood and its practitioners do not face any realistic threat of irreparable harm.  Both in its Complaint and its moving papers, Planned Parenthood suggests that its practitioners will be subject to criminal penalties if they misconstrue the Act and thereby fail to report an abortion complication.  (Dkt. 1 ¶ 32; Dkt. 7-1 at 1, 4-5, 19-20; Dkt. 7-6 ¶ 19.)  However, as was noted above, there is no criminal penalty for failing to report an abortion complication.  Idaho Code § 39-9506(3).  The criminal penalties will only be implicated if one of Planned Parenthood's practitioners report an abortion complication to IDHW with the knowledge that what they were reporting was false, or if one of Planned Parenthood's practitioners willfully discloses information contained in the confidential reports.  *See* Idaho Code § 39-9506(1) and (2).

For practitioners, there is the potential for a civil fine of $500 and discipline by their licensing agency for a willful failure to report information required by the Act.  Idaho Code § 39-9506(3)(b).  However, the potential for such repercussions is mitigated by the fact that they are only required to report complications that in their reasonable medical judgment are a direct or indirect result of an abortion and their failure to report such complications must be willful.

With respect to Planned Parenthood, there are no criminal penalties for facilities.  Idaho Code § 39-9506.  Planned Parenthood is subject to a civil fine of $1,000 for a first violation of the Act, and to license suspensions for subsequent violations.  Idaho Code § 39-9506(4).  However, Planned Parenthood only has a duty to report a complication if one of its medical practitioners has reason to believe, in his or her reasonable medical judgment, that the complication is the result of an abortion.  Idaho Code § 39-9504(1).  Given Planned Parenthood's representations regarding how rare complications are, there should be little to

report.  And if abortion is "one of the safest medical procedures in the United States," *i.e.*, low death rate, low complication rate, low infection rate, etc., then its five physicians who perform abortions should not be seriously or significantly burdened with this reporting requirement. (Dkt. 7-5 ¶¶ 22, 23, 46; Yee-Wallace Decl. Ex. A at 14-15 ¶ 46.)

Planned Parenthood also argues that it will suffer irreparable harm because the Act does not protect the identity of the medical provider, and poses a real threat that the identity of the patient will be revealed.  (Dkt. 7-1 at 19.)  This argument is based on Planned Parenthood's meritless argument that the Public Records Act somehow nullifies the privacy protections in the Act.  (*Id.* at 18-19.)  As was established above, the Public Records Act does not trump the specific and express privacy protections set forth in the Act.

Also, the Act expressly states that the identifying information for the patient should not be included in the reports.  Idaho Code § 39-9504(3).  While the reports will identify the medical provider (Idaho Code § 39-9504(2)), the reports are confidential (Idaho Code § 39-9504(6)), and disclosing the information in them is a crime (Idaho Code § 39-9506(2)).  In light of the foregoing, Planned Parenthood, its practitioners, and its patients do not face a realistic threat of irreparable harm.

DATED:  August 24, 2018.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By _/s/ Cynthia Yee-Wallace_
    CYNTHIA YEE-WALLACE
    Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson
daf@fergusondurham.com

Craig H. Durham
chd@fergusondurham.com

Hannah Brass Greer
hannah.brassgreer@ppgnhi.org

Richard A. Eppink
reppink@acluidaho.org

Molly Kafka
mkafka@acluidaho.org

Carrie Flaxman
carrie.flaxman@ppfa.org

  */s/Cynthia Yee-Wallace*
CYNTHIA YEE-WALLACE
Deputy Attorney General