# EXHIBIT A

DECLARATION OF CYNTHIA YEE-WALLACE
Case No. 1:18-cv-00319-DCN

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

CLAY R. SMITH, ISB #6385
clay.smith@ag.idaho.gov
CYNTHIA L. YEE-WALLACE, ISB #6793
cynthia.wallace@ag.idaho.gov
Deputy Attorneys General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
    Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS, a Washington corporation,<br><br>    Plaintiff,<br><br>v.<br><br>LAWRENCE G. WASDEN, in his official capacity as Attorney General of the State of Idaho; JAN M. BENNETTS, in her official capacity of Ada County Prosecutor; GRANT P. LOEBS, in his official capacity of Twin Falls County Prosecutor; IDAHO STATE BOARD OF MEDICINE,<br><br>    Defendants. | Case No. 1:15-cv-00557-BLW<br><br>**STIPULATED FACTS** |

STIPULATED FACTS - 1

The parties stipulate that the following facts may be filed with the Court and as a result, made publicly available. Other than the facts set forth below, Planned Parenthood does not waive any other designation of confidentiality made pursuant to the provisions of the Stipulated Protective Order (Dkt. 31) in this case as to any other facts or evidence.

## STIPULATED FACTS

The following Stipulated Facts are based upon the documents, data, and expert witness reports produced in discovery in this case, as well as deposition testimony taken in this case. The following physicians were retained as expert witnesses: Dr. Mark Nichols, an ob-gyn at Oregon Health Sciences University, Portland, OR, submitted an expert report for Plaintiff. Dr. Earl Monte Crandall, an ob-gyn in Twin Falls, and Dr. Marietta Thompson, an ob-gyn in Boise, submitted expert reports for Defendants.

**A.  The Legislation.**

1.  This case involves two laws enacted during the 2015 legislative session, (1) House Bill 189 (2015 Idaho Sess. Laws 308), now codified at Idaho Code §§ 54-5701 *et seq.*;[1] and (2) House Bill 154 (2015 Idaho Sess. Laws 1123), now codified at Idaho Code § 18-617.

2.  Idaho Code §§ 54-5701 *et seq.* is known as the Idaho Telehealth Access Act ("Telehealth Act"). It provides standards for using telehealth to provide medical care in Idaho. It is intended to enhance access to health care particularly where there are provider shortages or geographic barriers. Idaho Code § 54-5702.

3.  Section 54-5707(3) of the Telehealth Act prohibits physicians from providing

---

[1] In 2015, the Telehealth Access Act was titled under Idaho Code §§ 54-5601 *et seq.*, but was amended and redesignated to Idaho Code §§ 54-5701 *et seq.* in the 2016 legislative session.

medication abortions[2] through telemedicine. Specifically, it provides: "No drug may be prescribed through telehealth services for the purpose of causing an abortion" (hereafter, "telehealth medication abortion prohibition").

4. Idaho Code § 18-617, entitled "Chemical Abortions," was added in 2015 as a provision in the Idaho abortion statute related to medication abortions. It codifies several requirements for medication abortion. One provision is challenged in this case, specifically the provision stating that "[n]o physician shall give, sell, dispense, administer, prescribe or otherwise provide an abortifacient for the purpose of effecting a chemical abortion unless *the physician*," among other things:

> (e) *Has examined in person* the woman to whom the abortifacient is administered to determine the medical appropriateness of such administration and has determined that the abortifacient is sufficiently safe for use in the gestational age at which it will be administered[.]

Idaho Code § 18-617(2)(e) (emphasis added) ("in-person examination requirement").

5. The Telehealth Act was developed over the course of several months by the Idaho Telehealth Council, a council created in the 2014 House Concurrent Resolution No. 46. The Council was tasked with coordinating and developing "a comprehensive set of standards, policies, rules and procedures for the use of telehealth and telemedicine in Idaho."[3]

6. The purpose of the Telehealth Act is to facilitate the safe use of telehealth, and expand access to health care in Idaho. *See* Idaho Code § 54-5702. The law ensures that providers use the same standard of care via telemedicine they would otherwise use in an in-person encounter. *See* Idaho Code § 54-5704.

7. As initially drafted, the draft telehealth bill did not include an exception for

---

[2] As used in these Stipulated Facts, the term "medication abortion" refers to an abortion effectuated through the use of medications as described in Subsection B herein.
[3] http://telehealthcouncil.idaho.gov/ last visited on December 23, 2016.

STIPULATED FACTS - 3

abortion. (Steckel Dep. Ex. 23, at 3 and Ex. 24.) This changed as a result of conversations between Molly Steckel, who was the Idaho Medical Association (IMA) representative to the Telehealth Council, and some members of the legislature. (Steckel Dep. at 35:22–38:4.) Based on her conversations with legislators and lobbyists, Ms. Steckel was concerned that the telehealth legislation could fail entirely if it did not exclude abortion. (*Id*. and at 38:5–39:8.)

8. At a Telehealth Council meeting on January 29, 2015, Ms. Steckel informed the Council about the potential "obstacle" regarding abortion and the telehealth bill. (Steckel Dep. at 38:1-11 and Ex. 23, at 3.) At that meeting, Ms. Steckel made a motion to include the language that became the telehealth medication abortion exclusion into the legislation, and the motion was passed by the Council. (*Id*. at 42:13-19; 44:17-19, and Ex. 23, at 3.) The sole basis for the amendment was a political consideration; there was no discussion among the Council of any medical benefit that would result from the abortion exclusion. (Steckel Dep. at 39:9-22; 42:13–43:15 and Ex. 28, at 2-3.)

9. Medication abortion is the only medical treatment explicitly excluded from the Telehealth Access Act, and the medications used for abortions are the only medications that cannot be prescribed via telehealth. *See* Idaho Code §§ 54-5701 *et seq.*

**B. The medications used in medication abortions.**

10. The term "medication abortion" generally refers to the administration of two drugs in combination to end an early pregnancy: (1) Mifepristone (brand name Mifeprex and also known as RU-486); and (2) Misoprostol (also known as Cytotec). (Dr. A Dep. at 55:1-18; Dr. B Dep. at 68:25–70:6.) This FDA-approved combination is indicated for the medical termination of intrauterine pregnancy through 70 days gestation, measured from the last menstrual period (lmp). (Dr. Crandall Dep. Ex. 63, at 2.) According to the FDA-approved Mifeprex label, the

STIPULATED FACTS - 4

patient ingests 200 mg Mifeprex at her provider's office, and 24-48 hours later takes Misoprostol (800 mcg) buccally, (by putting each pill in her mouth, inside her cheeks). (*Id* at 3.)

11. Mifepristone works by blocking progesterone, the hormone that keeps a pregnancy viable. (Dr. Nichols Dep. at 30:12–32:10.) Without progesterone, the lining of the uterus breaks down and the pregnancy cannot continue. (*Id.*) Misoprostol causes uterine cramping and cervical dilation and causes the uterus to empty the pregnancy. (*Id.*) As the uterus empties, a patient will experience bleeding and cramping for several hours. (Dr. B Dep. Ex. 19, at 1.)

**C. Planned Parenthood's Health Services.**

12. Plaintiff Planned Parenthood of the Great Northwest and the Hawaiian Islands ("Planned Parenthood") operates three health centers in Idaho, in Boise, Meridian, and Twin Falls. (Slowriver Dep. at 10:10-11; Complaint ¶ 17.) Planned Parenthood provides various reproductive health services, including family planning services, cancer screenings, well woman exams, STI screenings and treatments, and abortion. (Complaint, ¶ 7.) Planned Parenthood provides medication abortions and in-clinic surgical abortions in Twin Falls and Meridian, and medication abortions only in Boise. (*Id.*) Without telehealth, women can get an abortion in Twin Falls two days per month from Planned Parenthood, when physicians drive in from Boise. (Slowriver Dep. at 73:22-25; *see* Dr. A Dep. at 9:5-9, 99:12-15.) At Planned Parenthood, abortions are performed in Meridian one day a week; in Boise, they are scheduled based on patient need and physician availability. (Slowriver Dep. at 73:8-21; Dr. A. Dep. at 18:4-7, 29:22–30:9, 99:16–100:12.)

13. Planned Parenthood has been performing medication abortions in Idaho since 2006. (Dr. B. Dep. at 91:17:21.) There are a total of five physicians who perform abortion

services through Planned Parenthood in Idaho. (*Id.* at 49:1-4.)

14. Idaho law states it is unlawful for any person other than a physician to cause or perform an abortion. Idaho Code § 18-608A.

15. Planned Parenthood requires its physicians to follow the medical standards and guidelines adopted by the Planned Parenthood Federation of America ("PPFA"), (Dr. A Dep. at 45: 2-8) which, according to Planned Parenthood's expert, are evidence-based protocols aimed at ensuring a high level of care for each patient. (Dr. Nichols Dep. at 40:23–41:3; Dr. Nichols Report ¶ 26.)

16. Planned Parenthood physicians follow the regimen described in the FDA-approved Mifeprex label when providing a medication abortion. (Dr. B. Dep. at 68:25–70:10; Dr. A. Dep. at 55:1-15; Dr. Crandall Dep., Ex. 63 at 3.)

17. In Idaho, specially trained staff (usually a Patient Care Coordinator "PCC") as well as other trained and certified staff provide the pre-procedure services for medication abortions. (Dr. A Dep. at 19:22–20:16, 21:13-19, 21:22-25, 22:1-4, 22:9-24, 23:12-17, 24:6–25:16, 26:16-23, 40:4-14, and Ex. 4; Dr. B Dep. at 42:20–43:24, 55:1-12.)

18. Prior to a medication abortion, each patient is examined and screened for medical eligibility as follows:

> a. A PCC screens each patient to ascertain she is confident in her decision to terminate the pregnancy, collects information the physician will need to determine if the woman is eligible for a medication abortion, and provides educational information for informed consent. The woman is also provided state-generated materials about abortion, required under Idaho Code § 18-609. (Dr. A Dep. at 19:14–22:15 and Ex. 4.)

STIPULATED FACTS - 6

  b. Women who go to Planned Parenthood are advised of their other pregnancy options and are screened to ensure they have not been coerced. (Dr. A Dep. Ex. 12 at 1; Hawkins Dep. at Ex. 46, at 7.) Staff are trained to ask open ended, non-judgmental questions aimed at ensuring that women understand that they are free to make their own choice to proceed or not proceed with the abortion. (Dr. A Dep. Ex. 12.)

  c. Women seeking a medication abortion through Planned Parenthood undergo required laboratory testing and diagnostic imaging which includes a limited ultrasound to confirm an intrauterine pregnancy and the gestation of the fetus; RH typing; blood work to detect anemia; Chlamydia and Gonorrhea screening per CDC guidelines; and other tests as indicated. (Dr. A. Dep. 44:22–45:8, 51:1–52:1, and Exs. 11, 12.)

  d. Women seeking a medication abortion through Planned Parenthood are screened for anemia, bleeding disorder, breastfeeding, heart disease, diabetes mellitus, hypertension, kidney failure, and liver disease. In addition, Planned Parenthood screens for the contraindications to medication abortion, which are listed on the Mifiprex FDA label: chronic adrenal failure, corticosteroid use, hemorrhagic disorders or anticoagulant therapy, inherited porphyrias, intrauterine device in place, and known or suspected ectopic pregnancy. (Dr. A. Dep. at 45:23–49:10, Ex. 12, Ex. 63 at 4-6.) These medical conditions are screened through medical history, vital signs, blood work, and limited ultrasound. (*See* Dr. A. Dep. at 45:5–52:1.)

19. Women in Idaho are also screened for: (a) unwillingness to have surgical follow-

STIPULATED FACTS - 7

up if medications do not succeed in completing the abortion; (b) inability or unwillingness to have a follow up visit to confirm the pregnancy was terminated; (c) lack of access to a telephone or emergency medical care and transportation; (d) a condition that would preclude aspiration procedure in an outpatient setting; (e) lack of support at home; or (f) residing more than one hour from emergency care. (Dr. A Dep. Ex. 12; Dr. B. Dep. at 54:12–59:12.) If a patient falls into any of these categories, Planned Parenthood does not proceed with a medication abortion. (*See* Dr. A Dep. Ex. 12; Dr. B. Dep. at 54:12–59:12.)

20. Planned Parenthood's ultrasound protocols are designed to screen for unexpected findings, such as early pregnancy loss, lack of pregnancy, suspected ectopic pregnancy, or a pregnancy that has a gestation greater than 70 days. (*See* Dr. Nichols Report at ¶¶ 26, 27.) When an ultrasound shows anything other than a normal pregnancy, further evaluation is done before the medication abortion is performed. (Dr. A Dep. at 24:21–25:10.) For example, if the ultrasound does not show a pregnancy in the uterus, it is treated as a suspected ectopic and further evaluation is done by a licensed provider who either will confirm an intrauterine pregnancy or will refer the patient to a provider outside of Planned Parenthood for further assessment of a suspected ectopic pregnancy. (*See* Dr. A. Dep. at 27:20–29:15; Dr. B. Dep. at 60:15-22 and Ex. 17.) Planned Parenthood will not perform the medication abortion until an intrauterine pregnancy is confirmed. (Dr. A Dep. at 28:18–29:15.)

21. If during the intake and medical history, a woman discloses she has bleeding or cramping, a licensed provider evaluates further to determine the cause of the bleeding and cramping before the medication abortion is performed. (Dr. A. Dep. at 37:18–38:10.)

22. Patients of Planned Parenthood receive written materials that explain what will happen during a medication abortion, the risks of the procedure, the surgical alternative, and

STIPULATED FACTS - 8

information about a follow up visit. (Dr. A Dep. 40:10-14, 41:2–42:23, and Exs. 6, 7, 8, 9.) Planned Parenthood staff review this information verbally with the patient and ascertain that she understands her options, and the risks and benefits of each option, all of which are aimed at ensuring that the patient is able to make an informed choice for herself. (*Id.*)

23. Each woman is offered screening for sexually transmitted infections in accordance with Centers for Disease Control guidelines. (*See* Dr. B. Dep. at 114:24-115:1) This screening is done with a urine sample. (Slowriver Dep. at 65:24–66:2, 68:13-21.) Planned Parenthood staff also provide women with written materials detailing how to take the medications, what symptoms to expect when the medication is taken, and how to call Planned Parenthood if she has concerns after she takes the pills, and verbally review this information with the patient. (Dr. A Dep. at 41:10–42:16, and Exs. 8, 9.)

24. Before meeting with the patient on the day of the medication abortion, the physician reviews the patient chart to assess the health history, ultrasound, and any other indicators that would render the woman ineligible for a medication abortion. (Dr. A Dep. at 32:10–37:7; Dr. B Dep. at 53:13–54:11, 63:14–70:6.) The physician ascertains that all the consents have been signed, and then orders the medications. (*Id.*) The physician speaks with the patient to confirm whether there is informed consent, she is confident in her decision, she understands her options, and her questions have been answered. (*Id.*) Once the physician has determined that the woman is medically eligible and wants to proceed, the physician instructs the patient to take an antibiotic and the Mifepristone. (*Id.*) The physician then instructs the patient to take the Misoprostol for use at home within 24-48 hours, and ensures the patient understands how to use the medication, and how to contact Planned Parenthood if she has questions or concerns. (*Id.*)

STIPULATED FACTS - 9

25. Defendants' expert testified that conducting a pelvic exam in the medication abortion context would further the interests of patient health. (Crandall Report at 1.) Physicians at Planned Parenthood do not perform pelvic exams on a woman seeking a medication abortion unless there is an indication to do one. In the medication abortion context, Planned Parenthood's physicians testified that pelvic exams are performed only in rare circumstances. (Dr. A Dep. at 37:13–22, 49:24–50:9; Dr. B Dep. at 78:21–24, 79:4-9, 81:20–82:9; 91:4-9.) The most common indications to perform a pelvic exam are pain/cramping or bleeding. (Dr. A. 37:20-22.) If a patient is experiencing pain or bleeding, a Planned Parenthood clinician will assess and evaluate the symptoms and will conduct a pelvic exam when indicated. (Exh. 11; Dr. A. Dep. at 37–38.)

26. Patients who receive medication abortions at Planned Parenthood are scheduled for a follow up visit to confirm the pregnancy is terminated. (*See* Dr. A. Dep. 62:5–63:20, 64:19-25.) Patients may have a follow-up ultrasound in approximately two weeks, or have blood tests—one the day of the abortion and the other approximately seven days later at the health center or other lab near their home. (Dr. A Dep. at 62:10-14.)

27. If a patient does not return for a follow up visit, Planned Parenthood contacts her, first by telephone, and then by letter. (Slowriver Dep. at 126:21-25.) Approximately 82% of women return for a follow up visit. (*See* Yates Dep. 12:7-9, and Ex. 47 at 7.)

**D. Planned Parenthood's protocols for telehealth and medication abortions in Idaho.**

28. A preliminary injunction was entered by this Court and permitted Planned Parenthood to begin offering medication abortions via telemedicine to patients at the Twin Falls health center. (*See* Dkt. 25; *and see* Slowriver Dep. at 17:7-22.)

29. The screening and protocols at Twin Falls for a medication abortion using telemedicine are the same as for medication abortions provided in-clinic, except that the visit

with the physician is done by interactive video conferencing. (Slowriver Dep. at 107:10–110:1; Dr. A. Dep. at 77:15–78:23; Dr. B. Dep. at 107:10–108:5, and Exs. 16, 18, 19.) At a telehealth visit, the medications will be placed on a tray next to the patient. (Dr. A Dep. Ex. 16 at 2-3.) As in the in-person visit, the physician will watch the patient swallow the Mifepristone, and instruct her to take the Misoprostol home for use in 24-48 hours. (Slowriver Dep. at 108:20–110:1; Dr. A. Dep. at 78:11-23; Dr. B. Dep. at 104:12–105:19, and Ex. 16 at 3.)

30. With telemedicine medication abortions in place, when a patient calls for an appointment for a medication abortion, Planned Parenthood will be able to inform her of the telehealth option if that will allow her to have the procedure sooner or closer to her home. (*See* Slowriver Dep. at 115:2–116:23.) Patients will also be informed of the differences between telemedicine and face-to-face visits, and each patient will be required to sign a consent to use telemedicine if that is the patient's desired option. (Dr. A Dep. Ex. 16 at 1-2.) Patients will be informed that if at any time, they are unsatisfied with the telehealth process, they can end the visit and attempt to reschedule an in-person appointment. (Dr. B Dep. Ex. 18.)

**E.  The statutory requirements.**

31. The Statements of Purpose for both HB 154 and 189 are silent on whether there is any medical purpose or medical benefits for the telehealth medication abortion prohibition or the in-person examination requirement. (*See* 2015 Idaho Sess. Laws 1123.)

32. "Examine[] in person" is not defined in Idaho Code § 18-617, nor is there any discussion of the meaning in the Statement of Purpose for HB 154. (*See id.*)

33. The testimony in this case evidenced that a physician's "examination" of a patient can consist of an "eyeball exam," to determine that the patient is well and healthy and confident in her decision, alongside a review of the patient's medical history and test results. (*See* Dr. B

Dep. at 82:10–83:22.) This type of examination could occur using telemedicine. (Dr. Nichols Dep. at 52:21–55:19.)

34. An "examination" of an OB/GYN patient can also mean a physician's in-person face-to-face contact with the patient to assess the patient's emotional and psychological state. (Thompson Report at 11.) Generally, eye contact and touching fosters an empathic relationship between patient and physician. (*Id.*) However, eye contact and touching is not the only way to form an empathic relationship with a patient. (Thompson Dep. 179:1-6). Conversation with the patient is the biggest aspect of communication. (*Id.* 179:7-17.) Part of forming trust in the patient-physician relationship involves the team of individuals who take care of the woman at a particular clinic, including the staff members who interact with the patient. (*Id.* 179:7-25.) Staff members can help and oftentimes create the initial trust when they first meet with a patient. (*Id.* 180:1-4.)

35. An "examination" of an OB/GYN patient could also mean a pelvic exam. (Crandall Report at 1.) However, even in contexts other than a medication abortion, there are instances when, in the physician's judgment, a pelvic examination is not necessary or medically indicated. (Dr. Thompson Dep. 173:4–174:15; Dr. A Dep. at 37:13–22, 49:24–50:9; Dr. B Dep. at 78:21–24, 79:4-9, 81:20–82:9.)

36. Across medical practice, it is common for physicians to rely on other staff to screen patients, e.g., by performing blood work and other tests, checking vital signs, and taking medical history. (Dr. Nichols Report ¶ 43.) This role does not require the physician's physical presence. (*Id.*)

37. At Planned Parenthood, whether a physician is at the health center, or using a remote site, the physician's role in the provision of medication abortion is: review the results of

Case 1:15-cv-00357-BLW Document 129 Filed 08/24/16 Page 13 of 20

these tests, alongside the patient's medical history, confirm that she is eligible for a medication abortion; meet with the patient, explain the procedure, answer her questions, and confirm her informed consent and willingness to proceed; ensure she understands how to take the medications; and provide her with the medications. (Dr. Nichols Report ¶ 44.)

38. It is not the standard of care, either in Idaho or nationally, to perform a routine pelvic exam before providing a medication abortion. (Dr. A Dep. at 38:11-15; Dr. B Dep. at 82:19-22.)

39. A pelvic examination can be invasive for patients. (Dr. Crandall Dep. at 170:15-17; Dr. A. Dep. at 38:16-21; Dr. Nichols Rebuttal Report ¶ 2.) In particular, victims of rape, or women who have experienced sexual abuse or molestation or other trauma, may want to avoid further trauma from having instruments placed in their vagina, such as during a pelvic exam. (Dr. Thompson Dep. at 177:12-23; Dr. Nichols Rebuttal Report ¶ 2.)

40. PPFA and the National Abortion Federation, the two national organizations that accredit abortion providers, do not require a pelvic exam be performed before every medication abortion. (Dr. Nichols Rebuttal Report ¶ 4; Dr. Crandall Dep. at 173:24–174:12.) Similarly, ACOG, the national organization of obstetricians and gynecologists, issues guidelines for medication abortion. These guidelines do not require routine pelvic exams for patients who have had an ultrasound. (Dr. Crandall Dep. Ex. 61 at 6.)

41. Planned Parenthood's screening of patients is designed to detect the limited number of medical conditions that might make a patient an inappropriate candidate for medication abortion. (Dr. Nichols Report ¶ 27.)

42. One of those medical conditions is ectopic pregnancy. (Dr. Nichols Report ¶¶ 26-27.) An ultrasound is superior to a pelvic examination when screening for ectopic pregnancies.

(Dr. Nichols Rebuttal Report ¶¶ 7-8; Dr. Crandall Dep. at 141:5-17; Dr. Thompson Dep. at 127:4-10; *see* Dr. Crandall Dep. Ex. 63 at 2.)

43. Patients also are screened to determine whether the pregnancy is within the 10-week gestational age limitation of the protocol. (*See* Dr. A Dep. at 47:15-17.) An ultrasound is the most accurate way to determine gestational age, and is more precise than a pelvic examination. (Dr. Nichols Rebuttal Report ¶ 5; Dr. Crandall Dep. at 118:9-16, 119:24–120:1, 121:23–122:4; Dr. Thompson Dep. at 87:22–88:2.)

44. A pelvic exam is not helpful in detecting the remaining contraindications for medication abortions recognized by the FDA and ACOG. (Dr. Nichols Rebuttal Report ¶ 4.) All of these remaining conditions are screened through a patient's medical history. (Dr. Nichols Rebuttal Report ¶ 9; Dr. Crandall Dep. at 153:1–155:24; Dr. Thompson Dep. at 134:15–138:1.) When Dr. Thompson was asked whether any of the contraindications noted by ACOG requiring a pelvic examination, she replied "I don't see anything that requires a pelvic examination." (Dr. Thompson Dep. 137:25–138:1.)

45. Even in individual cases where a pelvic exam is indicated (e.g., the patient is experiencing pain or bleeding), this exam can be provided by licensed non-physicians within their scope of practice. (*See* Dr. Nichols Rebuttal Report ¶ 6; *see also* Dr. Nichols Dep. at 26:1-18, 59:15-24.) Advanced practice clinicians (such as Advanced Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants) are qualified to perform pelvic examinations, and do so as part of their practice. (Dr. Nichols Rebuttal Report ¶ 6; Dr. Crandall Dep. at 174:13–177:3; Dr. Thompson Dep. at 45:20–46:23; 178:1-21.)

46. Dr. Nichols testified that medication abortion "is one of the safest procedures in contemporary medical practice," and that "[m]ajor complications from medication abortion are

extremely rare and far rarer than those associated with pregnancy and childbirth." (Dr. Nichols Report ¶ 20.) Dr. Crandall agreed "the overall safety of medication abortion is high. Complications are not common…." (Dr. Crandall Dep. at 183:3-4.)

47. In a recent study looking at the outcomes of 233,805 medication abortions performed in the United States, only .16 percent of patients experienced a significant adverse event and fewer than six out of every 10,000 experienced complications resulting in hospital admission. (Dr. Nichols Report ¶ 20.) And large-scale studies show a failure rate of 2%. (Nichols Report ¶ 21.)

48. When complications do arise, as a general matter, those complications are and can be managed by the provider and do not require a referral to a hospital or emergency care. (Dr. B Dep. at 88:19–89:2 and 123:24-25; Dr. C Dep. at 63:25–64:9; Dr. Nichols Dep. at 85:24–86:6; Dr. Nichols Report ¶ 31; *see* Dr. Thompson Dep. at 175:8–176:23.)

49. The most common complications associated with medication abortion are retained tissue or continuing pregnancy. (Dr. A Dep. at 94:12–95:12.) These conditions can be treated medically or surgically. (*See id.*) According to the National Abortion Federation, the incidence rate for retained tissue is <6%; the incidence rate of continuing pregnancy is <2%. (Yates Dep. Ex. 47 at 7.) At Planned Parenthood in Idaho, the incidence of retained tissue is less than 2% and the incidence of continuing pregnancy is less than 1%. (*See* Yates Dep. Ex. 47.) These conditions generally do not place the patient in an urgent or emergency situation, and can be managed in-clinic. (*See* Dr. A Dep. at 60:4-8; *and see* Dr. B. Dep. at 90:11–91:16.)

50. Between 2014-mid 2016, Planned Parenthood has performed approximately 1,200 medication abortions in Idaho and: (1) one patient required a blood transfusion; (2) no patient had an infection; and (3) no patient required hospitalization. (Dr. Nichols Report ¶ 24;

Confidential PP000001, PP000003, PP000005.)

51. These rates are in line with the overall safety statistics for medication abortion. (*See* Dr. Nichols Report ¶ 20; *and see* Dr. Crandall Dep. at 198:4–200:9.)

52. In Alaska, where Planned Parenthood performs medication abortions via telemedicine, the rates of complications for telemedicine patients were statistically comparable to those for patients who saw a physician face to face. (Yates Dep. at 28:2-17.) Moreover, the rate of telemedicine patients who returned for the follow-up visit was slightly *higher* than the rate of patients who had a face-to-face visit with a physician. (*See id.*)

53. Providers in Alaska report that telemedicine facilitates a more patient- centered approach to care where women were able to access care sooner, with greater choice in abortion procedure type, and closer to their home. (Dr. Nichols Report ¶ 35 n.26 (citing K. Grindlay, D. Grossman, *Telemedicine Provision of Medical Abortion in Alaska: Through the Provider's Lens*, J. Telemed Telecare OnlineFirst at 2 (July 14, 2016) (available at: http://jtt.sagepub.com/content/early/2016/07/14/1357633X16659166 .full.pdf?ijkey=h6S3yMxByzSdUGd&keytype=finite).)

54. ACOG has approved the use of telemedicine to provide medication abortion. (*See* Dr. Crandall Dep. Ex. 61.) ACOG issued Practice Bulletin No. 143 in March of 2014, stating, "[m]edical abortion can be provided safely and effectively via telemedicine with a high level of patient satisfaction; moreover, the [telemedicine] model appears to improve access to early abortion in areas that lack a physician health care provider." (Dr. Crandall Dep. Ex. 61 at 11.)

F.  **The Impact of the laws on women in Idaho.**

55. The Idaho Telehealth Act is intended to increase access to health care particularly for citizens who otherwise have limited access to care due to provider shortages or geographical

barriers. *See* Idaho Code § 54-5702. Telehealth enables citizens to be diagnosed and treated sooner, which results in improved health outcomes. Idaho Code § 54-5702(3).

56. The Idaho Telehealth Act allows physicians to establish a provider-patient relationship with interactive video conferencing. Idaho Code § 54-5705(1). A prior in person consultation is not required. *See id*.

57. If the challenged laws were allowed back into effect, women in Idaho seeking medication abortion would be denied the advantages of telehealth for that procedure.

58. The parties' experts agree that while medication abortion is a safe procedure, the risks from abortion increase as pregnancy advances. (Nichols' Report ¶6; Thompson Depo. at 177:1-9). The parties' experts also agree that delaying abortions until later in pregnancy drives up the risks of complications. (*Id*.)

59. The parties' experts also agree that a significant decrease in second trimester abortions indicates a public health improvement. (Crandall Depo. at 190:19-23).

60. In the absence of telemedicine, in order for Planned Parenthood providers to provide abortion services to women in the Magic Valley region, physicians from Boise travel to Twin Falls two days per month. (Slowriver Dep. 112:18–113:7; Dr. A Dep. at 98:13-19.)

61. For Planned Parenthood, telehealth addresses physician shortage and allows flexibility in scheduling. (*See* Slowriver Dep. at 113:8–117:3.) The preliminary injunction has allowed Planned Parenthood to offer medication abortions in Twin Falls more often than twice a month. (*See id.*)

62. Approximately one third of all women in this country will have an abortion in their lifetime. (Dr. Nichols Report ¶ 3.) Most of these women are living at or near the federal poverty level. (*Id*.)

Case 1:15-cv-00357-BLW Document 139 Filed 02/24/16 Page 17 of 20

63. For some women, particularly those who live in Twin Falls, Idaho, there are barriers to access to abortion that telemedicine could help to alleviate, including the cost of the procedure, lack of access to transportation, the cost and time of travel to a provider, inability to take time off from work or school, lack of child care, and other hurdles they must overcome. (Slowriver Dep. at 113:1-7; 122:7–123:8 *and see* Dr. A Dep. at 97:9-21; Dr. B Dep. at 97:23–98:10.)

64. Expanding access to medication abortions by offering this service more frequently at more locations via telemedicine will allow women to access abortion earlier in pregnancy, making some of the hurdles discussed above easier to overcome. (Dr. A Dep. at 97:9-21; *see* Slowriver Dep. 112:18–113:7; 122:7–123:8.)

65. If a woman is unable to get an appointment on days a physician is in Twin Falls, she may need to travel to Boise or Meridian for the procedure. Boise is approximately 256 miles round-trip from Twin Falls, and Meridian is approximately 272 miles round-trip from Twin Falls. For women experiencing domestic violence issues, it can be difficult for them to get away for a whole day to travel to Meridian or Boise. (Dr. A. Dep. at 97:9-21.) For some women, delaying an abortion may result in them becoming ineligible for a medication abortion. (*See* Slowriver Dep. at 112:18–113:7; Dr. A Dep. at 97:1-6; Dr. Nichols Report ¶ 4.)

66. Most women who choose a medication abortion have a strong preference for the medical option. (Dr. Nichols Report ¶ 15.) Some fear a procedure involving surgical instruments. (Dr. Nichols Report ¶ 17.)

67. For some women, a medication abortion is a better and safer option than a surgical abortion because of pre-existing medical conditions. (Dr. Nichols Report ¶ 18.)

DATED: DECEMBER 23, 2016.

**PLANNED PARENTHOOD OF THE
GREAT NORTHWEST AND THE
HAWAIIAN ISLANDS**

*/s/ Laura Einstein*
Laura Einstein, Chief Legal Counsel
Alice Clapman
Jennifer Keighley

**JONES, GLEDHILL, FUHRMAN,
GOURLEY, P.A.**
William A. Fuhrman

*Attorneys for Plaintiff*

**OFFICE OF THE IDAHO
ATTORNEY GENERAL**

*/s/ Cynthia Yee-Wallace*
*/s/ Clay Smith*
Deputy Attorneys General

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 23, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| William A. Fuhrman | bfuhrman@idalaw.com |
| Sam Dotters-Katz | SDottersKatz@idalaw.com |
| Laura F. Einstein | laura.einstein@ppgnhi.org |
| Alice Clapman | alice.clapman@ppfa.org |
| Jennifer Keighley | Jennifer.keighley@ppfa.org |

 */s/ Cynthia Yee-Wallace*
CYNTHIA YEE-WALLACE
Deputy Attorney General