# EXHIBIT D

DECLARATION OF CYNTHIA YEE-WALLACE
Case No. 1:18-cv-00319-DCN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PLANNED PARENTHOOD OF          )
INDIANA AND KENTUCKY, INC.,    )
                               )
            Plaintiff,         )
                               )
      v.                       )          No. 1:18-cv-1219-RLY-DLP
                               )
COMMISSIONER, INDIANA STATE    )
DEPARTMENT OF HEALTH, *et al.*, )
                               )
            Defendants.        )

**Plaintiff's Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

Planned Parenthood of Indiana and Kentucky, Inc. ("PPINK") is challenging two

provisions of the recently enacted Indiana Senate Enrolled Act No. 340 ("Enrolled Act"),

both of which are effective on July 1, 2018. The first is a new requirement that obliges

health care providers, including PPINK and its medical staff, to report all "abortion

complications." After August 31, 2019, the failure to report such complications will be a

crime, but after July 1, 2018, the failure to comply with the law may have dire licensing

consequences for PPINK and its physicians. However, the term "abortion complication"

is defined so broadly that it is impossible to determine what is or is not encompassed

within its vague boundaries. This offends due process.

Moreover, the term "abortion complication" and the illustrative, but not exclusive,

list of "abortion complications" contained in the statute include effects of abortions that

are considered normal side effects, not complications, but which may, after July 1, 2018,

1

require that PPINK report them, with potential adverse consequences. This is fundamentally irrational, which also offends due process. And, many of the complications listed in the statute are not likely or even possible complications of abortions at all, and are much more likely to occur following other medical procedures. But, there is no reporting requirement attached to these other medical procedures. This offends equal protection.

At the current time hospitals, ambulatory surgical centers, and abortion clinics are subject to inspections associated with their continued licensure biennially. However, the Enrolled Act alters this. While hospitals and ambulatory surgical centers may still be inspected every other year, abortion clinics are subject to annual inspections, despite the fact that abortions are statistically much safer than operations in hospitals and many of the procedures taking place in ambulatory surgical centers. This differential treatment is irrational and violates equal protection.

Although both of these statutory changes are unconstitutional, PPINK is seeking a preliminary injunction at this juncture solely concerning the "abortion complication" portions of the Enrolled Act.[1]  All of the requirements for the grant of a preliminary injunction are met here and one should therefore issue against the defendants ("State"), enjoining these portions of the Enrolled Act.

**The preliminary injunction standard**

---

[1]      To the extent that PPINK has requested a preliminary injunction concerning the statutory change concerning the frequency of inspections, Ind. Code § 16-21-3-2.6 (eff. July 1, 2018), PPINK withdraws that request.

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear.  In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

See, e.g., *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

**The relevant statutory law**

*The "abortion complications" provision and new reporting requirement*

The Enrolled Act creates a new statutory section, Indiana Code § 16-34-2-4-7 (eff. July 1, 2018), which requires all hospitals, physicians, and licensed abortion clinics to report to the Indiana State Department of Health information concerning the treatment of any and all patients for "abortion complications." Ind. Code § 16-34-2-4.7(b) (eff. July 1, 2018). The statute further provides that:

[a]s used in this section, "abortion complication" means any adverse physical or psychological condition arising from the induction or performance of an abortion. The term includes the following:

(1) Uterine perforation.
(2) Cervical perforation.
(3) Infection.
(4) Hemorrhaging.
(5) Blood clots.
(6) Failure to terminate the pregnancy.
(7) Incomplete abortion (retained tissue).
(8) Pelvic inflammatory disease.
(9) Missed ectopic pregnancy.
(10) Cardiac arrest.
(11) Respiratory arrest.
(12) Renal failure.
(13) Metabolic disorder.
(14) Shock.
(15) Embolism.
(16) Coma.
(17) Placenta previa in subsequent pregnancies.
(18) Pre-term delivery in subsequent pregnancies.
(19) Free fluid in the abdomen.
(20) Hemolytic reaction due to the administration of ABO-incompatible blood or blood products.
(21) Hypoglycemia occurring while the patient is being treated at the abortion facility.
(22) Physical injury associated with treatment performed at the abortion facility.
(23) Adverse reaction to anesthesia or other drugs.
(24) Psychological or emotional complications, including depression, suicidal ideation, anxiety, and sleeping disorders.
(25) Death.
(26) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018).

At some point before February 1, 2019, the Department of Health must inform the providers specified above of the new requirements concerning reporting of abortion

complications. Ind. Code § 16-34-2-4.7(f) (eff. July 1, 2018). However, as noted, the statute

is effective on July 1, 2018.

The "abortion complications" are to be reported to the Indiana State Department

of Health on a form to be developed by the Department before February 1, 2019. Ind.

Code § 16-34-2-4.7(c), (d) (eff. July 1, 2018). The Enrolled Act establishes that this report

must include the following information:

> (1) The date the patient presented for treatment for the abortion complication.
> (2) The age of the patient.
> (3) The race of the patient.
> (4) The county and state of the patient's residence.
> (5) The type of abortion obtained by the patient.
> (6) The date of abortion obtained by the patient.
> (7) The name of the:
>> (A) abortion clinic;
>> (B) medical facility; or
>> (C) hospital; where the patient obtained the abortion.
> (8) Whether the patient obtained abortion medication via mail order or Internet web site, and if so, information identifying the source of the medication.
> (9) Whether the complication was previously managed by the abortion provider or the abortion provider's required back-up physician.
> (10) The name of the medications taken by the patient as part of the pharmaceutical abortion regimen, if any.
> (11) A list of each diagnosed complication.
> (12) A list of each treated complication, with a description of the treatment provided.
> (13) Whether the patient's visit to treat the complications was the original visit or a follow-up visit.
> (14) The date of each follow-up visit, if any.
> (15) A list of each complication diagnosed at a follow-up visit, if any.
> (16) A list of each complication treated at a follow-up visit, if any.

Ind. Code § 16-34-2-4.7(e) (eff. July 1, 2018). Although, no identifying information of the

women is to be noted on the report., Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018), there is

no specification of what specifically qualifies as "identifying information."

The abortion complications reporting requirements supplant, at least for abortion providers, current regulations of the Indiana State Department of Health that require hospitals, ambulatory outpatient surgical centers, and abortion clinics to inform the Department of "reportable events." 410 IAC 15-1.4-2.2 (hospitals); 410 IAC 15-2.4-2.2 (ambulatory outpatient surgical centers); 410 IAC 26-6-2 (abortion clinics) These regulations are identical, except for the facilities to which they apply, and require the reporting of serious events such as: surgery performed on the wrong patient or body part; mistaken retention of foreign objects in a patient following surgery; patient death or serious disability associated with use of contaminated drugs, devices, biologics, medication error, falls, or burns.

After August 31, 2019, the failure to report an "abortion complication" will be a Class B misdemeanor. Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018).

At the current time, under existing Indiana law, health care providers who perform an abortion or who dispense medication for the purposes of inducing an abortion must provide certain detailed information concerning each abortion to the Indiana State Department of Health. Ind. Code § 16-34-2-5. The information that must be disclosed includes: the age of the patient, the date and location of the abortion, the name of the health care provider involved in the abortion, information concerning the post-fertilization age of the fetus and how that was determined, the method of the abortion, the woman's obstetrical history (including any prior abortions), and the results of all pathological examinations. Ind. Code § 16-34-2-5. Although not required by statute,

6

currently the report requires that providers also report if the following complications occurred during the abortion: hemorrhage, uterine perforation, cervical laceration, retained products, other complications (which must be specified), or no complications. (Attachment to Declaration of Christie Gillespie ["Gillespie"] Exhibit 1 to this Memorandum).

Existing law provides that annually the Indiana State Department of Health is to compile a public report summarizing the information from the terminated pregnancy reports, although the Department "shall ensure that no identifying information of a pregnant woman is contained in the report." Ind. Code § 16-34-2-5(e). The individual reports, minus the identifying information, are subject to release under Indiana's Access to Public Records Act. Ind. Code § 5-14-3-1, *et seq.*[2]

*Regulation of abortion clinics and physicians providing abortions*

An abortion clinic may lose or be denied a license for violating any provisions of

---

[2]     There is nothing in the Act that excludes these records from disclosure. The Act is to "be liberally construed," Ind. Code § 5-14-3-1, and PPINK is aware that its terminated pregnancy reports are routinely disclosed pursuant to third-party public records requests. (Gillespie ¶ 34; Declaration of Dr. John Stutsman ["Stutsman"] attached to this memorandum as Exhibit 2, ¶ 43; Declaration of Dr. Carol Dellinger ["Dellinger"] attached to this memorandum as Exhibit 3, ¶ 18).

Dr. Stutsman has been the medical director of PPINK since 2010 and is a board certified obstetrician/gynecologist and an Assistant Professor in Clinical Obstetrics and Gynecology at Indiana University School of Medicine. (Stutsman ¶¶ 2-3). He has served as the interim director of the School of Medicines Division of Family Planning since 2015. (Curriculum Vitae attached to Stutsman as Attachment 1). Dr. Dellinger is board certified in family medicine and is currently the Associate Medical Director of PPINK, where she also is a direct provider of abortion services for PPINK. (Dellinger ¶¶ 1-4).

Dr. Dellinger's declaration was sent to undersigned counsel electronically. The original has been mailed and should be in counsel's possession in the near future.

Indiana Code § 16-21; if it permits, aids, or abets the commission of any illegal acts in the clinic; engages in conduct or practices found to be detrimental to its patients; or if the application submitted or supporting documentation provides inaccurate information. 410 IAC 26-2-5(3), (6), (7).

Physicians, on the other hand, are regulated by the Indiana Medical Licensing Board. Ind. Code § 25-22.5-2-7; 844 IAC 5-2-1. The Medical Licensing Board has the power to discipline any physician who, among other things, "knowingly violate[s] any state statute or rule, or federal statute or regulation, regulating the profession in question." Indiana Code § 25-1-9-4(3).

**Facts**

It is believed that the following facts will be presented to support PPINK's request for a preliminary injunction.[3]

*General background to PPINK and its health centers*

PPINK operates numerous health centers in Indiana where thousands of women, men and teens receive reproductive health services and comprehensive sexuality education. (Gillespie ¶¶ 5-6). Surgical abortion services are provided in the three centers located in Bloomington, Merrillville, and Indianapolis. (*Id.* ¶ 8). In the health center located in Lafayette only non-surgical medication abortions are provided. (*Id.* ¶ 10). Medication abortions are also available at the health centers where surgical abortions are

---

[3]    Inasmuch as discovery has yet to be completed in this case, PPINK reserves the right to include additional facts in future filings or arguments.

performed. (*Id.* ¶ 9). Surgical abortions at these centers are available through the first trimester of pregnancy, 13 weeks and 6 days after the first day of a woman's last menstrual period. (*Id.* ¶ 8). The medication abortions are currently available through 70 days (10 weeks) after the first day of a woman's last menstrual period. (*Id.* ¶ 11).

There are 8 doctors providing abortion services at PPINK. (*Id.* ¶ 12). A number of the physicians are employees and a number are independent contractors. (*Id.*). They are all licensed by the Indiana Medical Licensing Board. (*Id.* ¶ 13).

*Abortion methods used by PPINK and their effects*

MEDICATION ABORTIONS AND THEIR NORMAL EFFECTS

At the current time, approximately one-third of PPINK's patients receiving an abortion opt for a medication abortion. (*Id.* ¶ 14). In a medication abortion, the patient will ingest two medications in pill form: mifepristone (also known as "RU-486" or by its trade name Mifeprex) and misoprostol. (Stutsman ¶ 16). Mifepristone blocks the activity of progesterone, which is a hormone that prepares the lining of the uterus for a fertilized egg and is necessary to maintain pregnancy. (*Id.* ¶ 17). Without progesterone, the lining of the uterus softens and breaks down so that the pregnancy cannot continue. (*Id.* ¶ 18). Misoprostol induces uterine contractions and the opening of the cervix, allowing the contents of the uterus to be expelled, similar to an early miscarriage. (*Id.* ¶ 19). The patient takes the mifepristone pill at the health center and will receive instructions on how to place the misoprostol pills between her cheek and gum herself, 24 to 48 hours later, at a location of her choosing. (*Id.* ¶ 20). After she does so, she will experience contractions that will cause the expulsion of the contents of her uterus. (*Id.*).

9

The Indiana State Department of Health, in its Informed Consent Brochure that is provided to all abortion patients, Ind. Code § 6-34-2-1.5, notes that misoprostol "causes cramps, heavy bleeding, and expulsion of the embryo." (Indiana State Department of Health, *Abortion Informed Consent Brochure* ["DOH Brochure"], Exhibit 4 to this Memorandum at 8.[4] It also notes that "[i]n addition to bleeding and cramping, you may experience dizziness, nausea, diarrhea, or vomiting; feel temporary abdominal pain; or have a mild fever or chills. It is normal to have some spotting or bleeding for up to four weeks." (*Id.* at 8-9.) The State does not consider these to be complications—they are just the normal consequence of the medication abortion that, in effect, cause a miscarriage. (*Id.*, *see also* Stutsman ¶ 21; Declaration of Dr. Sabrina Holmquist ["Holmquist"], attached to this memorandum as Exhibit 5, ¶ 19[5]). Although these are expected, temporary, and normal effects, routine abortion aftercare may involve the provision of additional counseling, pain medications for, and reassurance regarding, these effects. (Holmquist ¶ 19). This is part of the treatment that PPINK provides to its patients. (Gillespie ¶23).

---

[4] The brochure is available at https://www.in.gov/isdh/files/Abortion_Informed_Consent_Brochure.pdf (last visited May 15, 2018).

[5] Dr. Holmquist is a board certified obstetrician and gynecologist who is a faculty member of the University of Chicago's Pritzker School of Medicine and has 18 years of providing obstetric and gynecological care. (Holmquist ¶¶ 2-4).

Dr. Holmquist's declaration has been sent to undersigned counsel electronically. The original will be mailed and should be received by counsel in the near future.

Surgical Abortions and their normal effects

The surgical abortion method used by PPINK involves the dilation of a patient's cervix and the use of suction and/or instruments to aspirate (or empty) the contents of the patient's uterus. (Stutsman ¶ 22). Although called "surgical," a surgical abortion does not involve what a person might think of as surgery as it does not involve making an incision into the patient's skin. (*Id.*¶ 23; Holmquist ¶ 20). General anesthesia[6] is not used although a sedative may be given to the patient if she elects to receive one and patients receive a local numbing agent to the uterine cervix. (Stutsman ¶ 22). However, the patient never loses consciousness and remains responsive throughout. (*Id.*). After the abortion is concluded, the patient will be monitored for a period of time before leaving the center. (*Id.* ¶ 24). Before she leaves she will be given an antibiotic as a prophylaxis against infection. (*Id.* ¶ 25).

As the Department of Health's recognizes, normal side effects of a surgical abortion include "cramping and bleeding after the procedure. It is also normal to have no bleeding. [The patient] may pass a few blood clots and experience heavy bleeding for a few days. [The patient] may have spotting for up to six (6) weeks." (DOH Brochure at 7). Again, the Department of Health recognizes that these are not complications, just the normal effects to be expected after a surgical abortion. (*Id.*, *see also* Stutsman ¶ 26; Holmquist ¶ 22). These are not generally cause for concern and are managed at home, with additional counseling about the normal side-effects of abortion or suggestion of

---

[6] The term "general anesthesia" refers to something that is designed to cause a loss of consciousness and cause a medically-induced paralysis. (Stutsman ¶ 23).

11

over-the-counter pain medications; all of which is part of the routine abortion aftercare treatment provided to the patient. (Holmquist ¶ 22; Gillespie ¶ 23).

OTHER POTENTIAL EFFECTS OF SURGICAL AND MEDICATION ABORTIONS

Abortions, particularly in the first trimester, are extremely safe. (Stutsman ¶ 11; Dellinger ¶ 11; Holmquist ¶¶ 23-24). A very recent consensus report by the National Academies of Sciences, Engineering, and Medicine entitled *The Safety and Quality of Abortion Care in the United States* ("National Academies" [attached as Attachment 2 to Stutsman]) engaged in a comprehensive review of studies involving controlled trials, systematic reviews, and meta-analyses as well as a review of observational studies involving cohort and case control studies. (*Id.* at 1-22). After a voluminous review the National Academies concluded that "[t]he clinical evidence clearly shows that legal abortions in the United States . . . are safe and effective. Serious complications are rare." (*Id.* at 5-3). The report notes that:

> Death associated with a legal abortion in the United States is an exceedingly rare event. . . . [T]he risk of death subsequent to a legal abortion (0.7 per 100,000) is a small fraction of that for childbirth (8.8 per 100,000) (Bartlett et al., 2004; Zane et al., 2015). Abortion-related mortality is also lower than that for colonoscopies (2.9 per 100,000), plastic surgery (0.8 to 1.7 per 100,000), dental procedures (0.0 to 1.7 per 100,000), and adult tonsillectomies (2.9 to 6.3 per 100,000).

(*Id.* at 2-24 [footnotes omitted]). The informed-consent brochure prepared by the Department of Health also notes that the risk of death from childbirth greatly exceeds that of deaths from abortions. (DOH Brochure at 10).

The risk of death or serious complications is much greater during and after surgery where general anesthesia is used—something that PPINK does not do. (Stutsman ¶¶ 23,

30; Dellinger ¶ 10). As noted above, current regulations of the Indiana State Department of Health require hospitals, ambulatory outpatient surgical centers, and abortion clinics to inform the Department of "reportable events." 410 IAC 15-1.4-2.2 (hospitals); 410 IAC 15-2.4-2.2 (ambulatory outpatient surgical centers); 410 IAC 26-6-2 (abortion clinics). The Department requests information concerning 28 specific reportable events under the general subject headings of surgical events, products or device events, patient protection events, care management events, environmental events, and criminal events. (Indiana State Department of Health, *Indiana Medical Error Report System – Final Report for 2016* ["MERS –Final Report"] attached to this memorandum as Exhibit 6, at 16-18.[7]  The report indicates that, from 2006 through and including 2016, abortion clinics in the State of Indiana had no reportable events while hospitals averaged 99.3 a year and ambulatory surgery centers averaged 6.7. (*Id.* at 34). PPINK is not aware of ever filing or having to file such a report. (Gillespie ¶ 17).

Although rare, there are potential serious side effects from abortions. These are generally limited in the case of medication abortion to infection, significant bleeding beyond what is expected and normal, an incomplete abortion (meaning that the uterus has retained the products of conception or an ongoing pregnancy), and, in the case of surgical abortion, infection, significant bleeding, retained tissue, and uterine perforation or cervical laceration. (Stutsman ¶ 27; Holmquist ¶¶ 25-26). One study looked at a total of 33,846 women who underwent a medication abortion and found only 0.04-0.9%

---

[7]     The report is available at https://www.in.gov/isdh/files/2016_MERS_Report.pdf (last visited May 15, 2018).

experienced a severe adverse event requiring hospitalization. (Holmquist ¶ 25). These complications, in the event they occur, are generally appropriately and safely managed and resolved by the medical provider and do not result in any significant or longstanding damage to the health of the patient. (Stutsman ¶ 27; Holmquist ¶¶ 25-26). For example, most infections can be treated with oral antibiotics, uterine perforations, which are extremely rare, can be effectively managed without additional surgery or any hospitalization, and an incomplete abortion may be resolved with additional misoprostol, surgical abortion or uterine aspiration. (Holmquist ¶¶ 26, 52-53; Stutsman ¶ 8).

*The purpose of medical review and reporting requirements and the results of the reviews at PPINK*

The primary purpose for reporting adverse events in the medical setting is to enable both the medical community and government to better understand and monitor matters that affect the public health so that they may be better able to protect the general population and medical patients. (Holmquist ¶ 27).[8] Reporting and review allows steps to be taken to hopefully prevent the problem from recurring. (Stutsman ¶ 6; Dellinger ¶

---

[8]    At the current time, the only national adverse required reporting requirement is:

the FDA's Adverse Event Reporting Systems (FAERS), which is a database designed to support the FDA's post-marketing safety surveillance program for drug and therapeutic biologic products. Data regarding the risk of complications from procedures, surgeries and non-pharmacologic therapies are reported in the medical literature, but are not reported to the federal government. This is true for all medical procedures, including abortion.

(Holmquist ¶ 27).

13). If the adverse event occurred because of practitioner error, the review will allow a determination to be made as to whether the practitioner is safe to practice or if remedial steps need to be taken. (Stutsman ¶ 6; Dellinger ¶ 13). Additionally, if the adverse event is a consequence of a medication issue or a failure of a medical device, reports can be made to the FDA or appropriate agency to alert others. (Stutsman ¶ 6).

As noted above, the terminated pregnancy report that is completed for each abortion and given to the Indiana State Department of Health has on it a place to indicate if the abortions have the following complications: none, hemorrhage, infection, uterine perforation, cervical laceration, retained product, other (specify). (Attachment to Gillespie). PPINK complies with this reporting requirement. (Gillespie ¶ 19). It has always operated under the assumption that the "hemorrhage" that must be reported means an actual serious hemorrhage, distinct from any of the normal effects of abortion. (*Id.*).[9] Pursuant to national Planned Parenthood directives, the complications reported on the terminated pregnancy report are the serious adverse events that the medical director and assistant medical director reviews. (Stutsman ¶ 7; Dellinger ¶ 5). These reports disclose that PPINK has had very few serious complications, with the overwhelming majority of them concerning medication abortions where the abortion is not complete, leaving an ongoing pregnancy or retained tissue. (Stutsman ¶ 8). This is consistent with national statistics that demonstrate that abortion is overwhelmingly safe, that it rarely has complications, and that in a small percentage of cases medication abortions are not

---

[9] This is consistent with the common understanding in abortion and obstetric practice that "hemorrhaging" is "a significant loss of blood, generally over 500 cc." (Holmquist ¶ 50).

successful or leave retained products. (*Id.* ¶¶ 8, 14; Holmquist ¶¶ 23-25). As noted, this is generally resolved through additional misoprostol, surgical abortion or uterine aspiration. (Stutsman ¶ 8; Holmquist ¶ 52).

*The new "abortion complication" statute*

The new statute does not limit itself to the reporting of serious adverse events. Instead, it requires the reporting of "any adverse physical or psychological condition arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a). This is extremely broad and gives no guidance to PPINK and its medical staff, or to anyone else. (Stutsman ¶ 32; Dellinger ¶ 16; Holmquist ¶ 31). *Any* adverse condition is so broad that it could, for example, include the minor discomfort to be expected after any abortion. (Dellinger ¶ 17).

 The 26 examples given in the statute are of no help in defining or narrowing the scope of that statute as it is clear that these are just examples that are illustrative of what has to be reported, not an exhaustive list. (Stutsman ¶ 33; Dellinger ¶ 22). Moreover, many of the examples are so broad or vague that they do little to remedy the breadth and uncertainty of the general definition. (Holmquist ¶ 38). For example, "adverse reaction to anesthesia or other drugs" could be anything ranging from a serous reaction to a mild, transient itching. (Stutsman ¶ 40). The term "emotional complication" used in the statute has no defined medical meaning. (*Id.* ¶ 39). Similarly, the term "physical injury associated with treatment performed at the abortion facility" has no meaning given that temporary physical discomfort is an effect of an abortion, as it is with countless medical procedures and treatment. (*Id.* ¶ 41).

Some of the conditions on the list are not considered by the medical community to be "abortion complications" at all, and many do not bear any proven relation to abortion. (Holmquist ¶ 42). For example, as noted, both blood clots and bleeding are normal side effects. (*See* pages 10-11, *supra*). One of the listed items, "placenta previa in pregnancy," is a condition where the placenta lies low in the uterus next to or covering the cervix and is associated with carrying a pregnancy to term, not abortion. (Holmquist ¶ 43). And, hypoglycemia is low blood sugar and is completely unrelated to abortions. (*Id.* ¶ 41).

Further, the Enrolled Act lists many things that are unlikely to occur, or simply will not occur, during abortions. (Dellinger ¶ 26; Holmquist ¶ 46). These include such things as cardiac arrest, respiratory arrest, renal failure, shock, hemolytic reaction due to the administration of ABO-incompatible bold or blood products, embolism, coma and death. (Dellinger ¶ 26-27; Holmquist ¶ 46). All of these are much more likely to occur following plastic surgery, orthopedic surgery, hysterectomy, cesarean section, vaginal birth, anesthesia, and a host of other procedures. (Dellinger ¶ 26, Stutsman ¶34, Holmquist ¶ 46).

*The effects of Indiana's new "abortion complication" statute*

The statute is effective July 1, 2018 and, therefore, absent a preliminary injunction, PPINK will have to collect and be prepared to report information concerning abortion complications. (Gillespie ¶¶ 25-26). This will include not only women who are physically in a PPINK facility for treatment, but also women who call into PPINK after receiving an abortion seeking treatment for the normal effects of surgical or medication abortions. (Gillespie ¶ 23). This will require additional staff and staffing time to monitor any and

17

all complications and to discuss with the medical staff whether or not something is an abortion complication, an extremely difficult task given that it is unclear what is or is not an abortion complication. (*Id.* ¶ 27).

Because of its vagueness and breadth, the statute will not further the interests that are served by reporting requirements—the advancement of public health—as significant data is already available concerning the few actual complications associated with abortion. (Holmquist ¶¶ 16, 27, 55). And data shows that these actual complications only occur rarely and are nearly always effectively addressed and resolved with no long-term damage to patient health. (*Id.* ¶ 55). Moreover, over reporting risks "swamping" the system, making it meaningless. (Stutsman ¶ 10; Dellinger ¶ 14).

Regardless of staffing and administrative issues, the statute puts PPINK in a difficult situation.  It is impossible to discern the meaning of an "abortion complication." (Gillespie ¶¶ 28- 31). If PPINK does not treat every "adverse physical or psychological condition," no matter how routine and expected, and no matter how minor, as a reportable event, it runs the risk of being found in the future by the Department of Health to be out of compliance with its statutory responsibilities. (Gillespie ¶¶ 32, 35). This imperils PPINK as it can lead to attempts to revoke the licenses of its abortion clinics or to entirely actions against its doctors. (Gillespie ¶¶ 32, 35).

On the other hand, pro-life groups in Indiana have, in the past, after public record requests, reviewed all terminated pregnancy reports and have filed complaints that the reports have not been completed properly or otherwise demonstrated unlawful acts. (Gillespie ¶ 33; Stutsman ¶ 43; Dellinger ¶18). This has resulted in disciplinary actions

18

being filed against physicians before the Medical Licensing Board. (Gillespie ¶ 33; Stutsman ¶43; Dellinger ¶ 18). If PPINK treats everything, no matter how insignificant, minor, or unrelated to abortion, as a "complication" and reports it, this may very well lead to complaints being filed against it and its doctors. (Gillespie ¶ 33; Stutsman ¶44; Dellinger ¶ 18). It is obviously a matter of concern for a physician to be associated with numerous reports of complications in his or her treatment of patients. (Dellinger ¶ 19). There is therefore a risk to both PPINK and its medical staff in either underreporting and over reporting abortion complications. (Gillespie ¶¶ 32-33, 35-36).

Moreover, the reporting and publicizing of "abortion complications," even when the events are not serious or are not complications at all, will fuel an anti-abortion narrative that abortions are not safe, despite the overwhelming evidence to the contrary. (Gillespie ¶ 34; Dellinger ¶ 21; Stutsman ¶ 45). The reporting requirements could in fact undermine public health by publicizing irrelevant and misleading data. (Holmquist ¶ 55). This may, ultimately, discourage women from exercising their constitutional rights to obtain abortions. (Stutsman ¶ 45; Dellinger ¶ 21).

There are no other Indiana laws or regulations that impose comparable reporting requirements on physicians and health care facilities following procedures other than abortions, even though there is a much greater chance that many of the potential complications listed will occur with procedures other than abortions. (Stutsman ¶ 46; Dellinger ¶ 30).

**Argument**

**I. PPINK will prevail on the merits of its claim that the new abortion complications statute is unconstitutional**

**A. The statute provides no meaningful guidance on when "complications" must be reported and is therefore unconstitutionally vague**

As of July 1, 2018, PPINK is obligated to "report to the state department [of health] each case in which [it] treated a patient suffering from an abortion complication." Ind. Code § 16-34-2-4.7(b) (eff. July 1, 2018). But, the term "abortion complication" is defined in the broadest possible terms as "any adverse physical or psychological condition arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a). This definition provides no meaningful guidance to PPINK or its physicians as to the circumstances under which a report is statutorily required, and it is therefore unconstitutionally vague in violation of the most basic tenets of due process.

**1. Introduction to vagueness doctrine**

"Living under a rule of law entails various suppositions, one of which is that 'all persons are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)) (internal alteration omitted). Accordingly, "[t]he void-for-vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). While the Constitution does not demand "perfect clarity and precise guidance" of legislative enactments, *see Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)), it does

require that penal statutes define offenses "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing cases). *See also Sessions v. Dimaya,* --U.S.--, 138 S. Ct. 1204, 1212 (2018) (plurality) ("the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the action of police officers, prosecutors, juries and judges"); *Planned Parenthood of Ind. & Ky., Inc. v. Commissioner, Ind. State Dep't of Health* ("*PPINK I*"), 258 F. Supp. 3d 929, 949 (S.D. Ind. 2017) (describing void-for-vagueness principles in a recent challenge to another statute regulating abortion), *appeal pending*, No. 17-2428 (7th Cir.).[10]

Although the vagueness doctrine focuses "both on actual notice to citizens and arbitrary enforcement," the U.S. Supreme Court has recognized

> that the more important aspect of vagueness doctrine is not actual notice, but the other principle element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.

*Kolender,* 461 U.S. at 358 (internal quotations, citations, and alteration omitted). At the same time, the Court has noted that "[t]hese standards should not . . . be mechanically applied," and that "[t]he degree of vagueness that the Constitution tolerates—as well as

---

[10]    This Court in *PPINK I* resolved, on preliminary injunction, challenges to three separate statutes.  Although an appeal has been taken with respect to this Court's conclusion that a statute requiring that parents be notified under certain circumstances when a minor attempts to obtain an abortion, *see* 258 F. Supp. 3d at 937-48, the vagueness holding was not appealed.

the relative importance of fair notice and fair enforcement—depends in part on the nature

of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489,

498 (1982). Thus, while "economic regulation," "enactments with civil rather than

criminal penalties," and statutes containing "a scienter requirement" might be subject to

"a less strict vagueness test," a penal statute without those procedural safeguards

demands far greater precision. *Id.* at 498-99. [11]

Here, there can be no doubt that the challenged statute qualifies as a penal

statute—and one without a *mens rea* requirement—and therefore demands great

precision: beginning after August 31, 2019, the failure to report an abortion complication

will be a Class B misdemeanor.  Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018).  But the

reporting requirement itself takes effect on July 1, 2018, and at this point the failure to

---

[11]    However, it is incorrect to draw a bright line that alters the vagueness analysis to be
applied depending on whether or not the statute is deemed criminal. As Justice Gorsuch recently
noted in a case where a non-criminal statute was found to be unconstitutional:

> The government suggests that at least this Court's precedents support adopting a
> less-than-fair-notice standard for civil cases. But even that much I do not see. This
> Court has already expressly held that a "stringent vagueness test" should apply to
> at least some civil laws—those abridging basic First Amendment freedoms. This
> Court has made clear, too, that due process protections against vague laws are
> "not to be avoided by the simple label a State chooses to fasten upon its conduct
> or its statute." So the happenstance that a law is found in the civil or criminal part
> of the statute books cannot be dispositive. To be sure, this Court has also said that
> what qualifies as fair notice depends "in part on the nature of the enactment." And
> the Court has sometimes "expressed greater tolerance of enactments with civil
> rather than criminal penalties because the consequences of imprecision are
> qualitatively less severe. But to acknowledge these truisms does nothing to prove
> that civil laws must always be subject to the government's emaciated form of
> review.

*Dimaya*, 138 S. Ct. at 1228-29 (internal citations omitted) (Gorsuch, J., concurring).

report a complication may have licensing consequences for both PPINK and its physicians. *See* Ind. Code § 25-1-9-4(a)(3) (physicians subject to disciplinary action based on any knowing violation of the law); 410 IAC 26-2-8(b) (an abortion clinic's license may be revoked or denied based on any violation of the law). The Seventh Circuit has been clear that sanctions to a person's license are sufficiently severe to implicate void-for-vagueness concerns as well. *See United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129-30 (7th Cir. 1984); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123-24 (7th Cir. 1983); *PPINK I*, 258 F. Supp. 3d at 949.[12]

### 2.  The statute is unconstitutionally vague

It should require little citation to demonstrate that the statutory definition of "abortion complication" is hopelessly vague. After all, it includes—without any limitation whatsoever — "any adverse physical or psychological condition arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a).

---

[12]  As Justice Gorsuch stated,

[i]n fact, if the severity of the consequences counts when deciding the standard of review, shouldn't we also take account of the fact that today's civil laws regularly impose penalties far more severe than those found in many criminal statutes? Ours is a world filled with more and more civil laws bearing more and more extravagant punishments. Today's "civil" penalties include . . . remedies that strip persons of their professional licenses and livelihoods, and the power to commit persons against their will indefinitely. Some of these penalties are routinely imposed and are routinely graver than those associated with misdemeanor crimes—and often harsher than the punishment for felonies.

*Dimaya*, 138 S.Ct at 1229 (Gorsuch, J., concurring).

23

When a patient experiences the type of soreness following a surgical abortion that might be associated with any minor surgery, must PPINK report this "complication" if it provides "treatment" consisting of aspirin (or even "treatment" consisting of nothing more than a verbal explanation that such soreness is to be expected)?  When a patient is treated for the type of bleeding that is the ordinary and expected result of a surgical abortion, must PPINK report that "complication"?[13]  When a patient who receives a medication abortion subsequently reports to PPINK, seeking some sort of treatment, that she is experiencing drowsiness, fatigue, or a headache—all of which are known side-effects commonly associated with the drug—must PPINK report this "complication"?  When a patient is provided an antibiotic medication to ward against potential infection, does that constitute treatment for an "abortion complication"?  When a patient seeks treatment for minor depression or anxiety, perhaps years after the fact, does that qualify as an "abortion complication"?  Does that change if the practitioner concludes that that depression or anxiety would have been more severe if the patient had continued the pregnancy?  What if the depression results not from the abortion-as-such but rather from the reaction of a family-member who is morally opposed to abortion?[14]  PPINK and its

---

[13]    As noted, PPINK has operated on an understanding in the past that "hemorrhage" meant a serious blood loss. (*See* page 15, *supra*). However, the term is not defined in this new statute that provides for criminal penalties if PPINK guesses incorrectly as to the State's definition of the word.

[14]    Indeed, if that family-member (rather than the abortion patient) seeks treatment for depression because a loved one obtained an abortion, the statute would seemingly require that the *family-member's* depression be reported as an "abortion complication."  After all, that appears to still be an "adverse . . . psychological condition arising from the . . . performance of an abortion."

physicians, indeed all physicians in Indiana who must deal with these women seeking treatment, are left to guess at the answers to all of these questions. And, of course, if they guess wrong serious adverse consequences may occur. The bottom line is that the statute provides no meaningful guidance to determine the circumstances under which a report must be filed.

Outside of the challenged statute and two similar statutes from other jurisdictions, *see* Ark. Code § 20-16-702(4); 63 Okla. Stat. § 1-738j(2), the term "adverse physical or psychological condition" appears to be entirely unknown in the law. But, employing logic that cannot be meaningfully distinguished from this case, the Seventh Circuit has on multiple occasions invalidated a condition of supervised release prohibiting an individual from engaging in "any use of alcohol that *adversely affects* the defendant's employment, relationships, or ability to comply with the conditions of supervision." *See United States v. Sandidge*, 863 F.3d 755, 757 (7th Cir. 2017); *United States v. Siegel*, 753 F.3d 705, 715 (7th Cir. 2014). Explained the court in *Sandidge*:

> This open-ended and indeterminate language . . . raises concerns about fair notice to defendants trying to comply and leaves room for arbitrary enforcement by supervising agents.
>
> What qualifies as an "adverse" effect on a defendant's relationships, employment, or compliance capabilities? Do minor or attenuated effects count? If Sandidge is five minutes late to work because he had a few drinks the night before and overslept, has he violated the condition? What if a friend who is a teetotaler takes offense when Sandidge consumes *any* amount of alcohol in his presence? Does that count? How about a falling-out with a friend after a single beer? The capacious and indefinite language of this condition leaves the boundaries uncertain and allows room for arbitrariness to creep in.

*Sandidge*, 863 F.3d at 758. So too here. Are "minor or attenuated" (or expected) adverse

conditions considered "abortion complications"? Is an adverse psychological response to the criticism of a friend with moral objections to abortion—the corollary to *Sandidge*'s "friend who is a teetotaler"—such a complication? There is no meaningful distinction between the Seventh Circuit's conclusion in *Sandidge* that the phrase "adversely affects" is unconstitutionally vague and the challenged statute's use of the phrase "any adverse physical or psychological condition." The statute is unconstitutional.[15]

Nor is the statute saved by its inclusion of twenty-six examples of a qualifying "abortion complication." This is so for two reasons. First, these examples are introduced with that the statement that "[t]he term [abortion complication] *includes* the following." Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018) (emphasis added). But "[i]nclude is a word of illustration, not limitation," *Richardson v. National City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998), and so the statutory examples do not remotely cabin the vague definition itself. And second, just as importantly, the breadth of the examples themselves renders them just as meaningless as the statutory definition. For instance, the term "adverse reaction to anesthesia or other drugs" could include a mild, transient, and

---

[15]     To be sure, the Seventh Circuit in *Sandidge* cured the vagueness problem that it identified by simply adding the word "materially" to the challenged condition—thereby prohibiting "any use of alcohol that *materially adversely affects* the defendant's employment, relationships, or ability to comply with the conditions of supervision." 863 F.3d at 759 (emphasis added). Of course, a court may not rewrite a statute in the same manner that it may rewrite court-ordered conditions of supervised release. *See, e.g.*, *National Ass'n of Mfrs. v. Department of Defense*, --U.S. --, 138 S. Ct. 617, 629 (2018); *Lamie v. United States Trustee*, 540 U.S. 526, 537 (2004); *Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441-42 (7th Cir. 1992). But even were that not so, adding such a modifier here would not add any clarity. After all, even if the statute defined an "abortion complication" as "any *materially* adverse physical or psychological condition," PPINK and its doctors would still be left to guess what precisely the "condition" must be "material" to. There does not appear to be any clear answer to that question.

ultimately innocuous reaction. (Stutsman ¶ 40). Indeed, two of the listed examples — "[p]hysical injury associated with treatment performed at the abortion facility" (Ind. Code § 16-34-2-4.7(a)(22)) and "[p]sychological or emotional complications" (Ind. Code § 16-34-2-4.7(a)(24)) — do not appear to differ in any meaningful respect from the statutory definition itself ("adverse physical or psychological condition"). The list of examples enumerated in the statute therefore appears to be entirely circular. It adds no clarity to an utterly unclear requirement.

Moreover, at least some of the examples include conditions that are admittedly the expected and normal effects of an abortion. (*See* p. 16, *supra*.). But, no guidance is provided to assist PPINK and its doctors in their efforts to determine how to respond to normal side effects that may, or may not, now be deemed by the State or law enforcement to be an abortion complication. The statute fails to clearly establish the minimal guidelines demanded by due process.

### B.    The statute is irrational and arbitrary in violation of due process

The statute requires the reporting of events that are not necessarily serious complications of abortion procedures, or even complications at all. While there may be reason to report serious and unexpected events so that they will not recur and, if necessary, to target practitioners who are engaging in problematic behavior, there is no rational reason to demand that "any adverse physical or psychological condition" be reported. This is particularly true when such a broad reporting mandate will not only pose administrative problems for PPINK, but can potentially lead to actions against it and its physicians' licenses and may ultimately prove injurious to public health by

erecting a barrier of misinformation that will face women seeking abortions. This is utterly irrational and violates due process.

At a minimum, substantive due process under the Fourteenth Amendment prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Thus, if the "legislature has acted in an arbitrary and irrational way," due process has been violated. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

Admittedly the standard demanded by substantive due process here is "deferential" to the State, *Lee v. City of Chicago*, 330 F. 3d 456, 467 (7th Cir. 2003). But, it is not toothless. Indeed, the Seventh Circuit recently struck down another Indiana statute regulating abortion practice because it was not deemed to be rationally related to an important government interest. *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health*, 888 F.3d 300, 307-310 (7th Cir. 2018), *pet. for reh'g en banc pending.* Courts do strike down governmental enactments that are fundamentally irrational, arbitrary, or capricious. *See, e.g., Berger v. City of Mayfield Heights,* 154 F.3d 621, 624-26 (6th Cir. 1998) *(*finding an ordinance requiring that all growth from vacant lots be cleared if lot has less than 100 feet of street frontage to be irrational in violation of, among other things, substantive due process); *Buquer v. City of Indianapolis*, No. 1:11-cv-708 SEB-MJD, 2013 WL 1332158, at *14 (S.D. Ind. Mar, 28, 2013) (finding that an Indiana law that prevented persons from using consular-issued identification cards for identification was "not rationally related to the stated government interest, and thus, violates substantive due process").

Regardless of the propriety of requirements mandating the reporting of serious events occurring to patients, there is no rational reason to require the reporting of normal effects associated with abortions or minor complications that are anticipated and are routinely dealt with (*e.g.,* a transient allergic reaction to a sedative). As Judge Barker noted in striking down the prohibition on the use of consular identification cards, where the State attempted to justify the prohibition by arguing that it wanted to ensure the reliability of identification to prevent fraud, "[a]lthough we do not dispute that the stated purpose . . . is a legitimate governmental purpose, the breadth of [the statute] . . . far exceeds its stated purpose and therefore is not rational." *Buquer*, 2013 WL 1332158, at *13. The same is true here. The requirement imposed on PPINK to report "any adverse physical or psychological conditions arising from" an abortion is utterly irrational and, given the burdens and potential burdens imposed on PPINK and its staff, and the potential negative impact on women considering an abortion, is arbitrary and unconstitutional.

### C. The statute also violates equal protection

The statute creates new rules for the reporting of "abortion complications," while ignoring the reporting of events following other procedures, even though certain of the "abortion complications" are much more likely to occur, if at all, with the non-abortion procedures. Thus, certain persons will have to file reports as to "complications" while others, whose patients have identical or much more severe results after surgery or other medical events, will not. This distinction and discrimination is irrational and violates equal protection.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a directi[ve] that all persons similarly situated should be treated alike." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (internal citation omitted). The first step in this analysis "is to identify the [defendants'] classification of groups," which can be accomplished by showing that a statute "imposes different burdens on different classes of people." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (alteration in original) (citations omitted). The next step in equal protection analysis is to determine the applicable level of scrutiny, but even under the lowest level of scrutiny, applicable here, a classification must fail if there is no legitimate basis for the distinctions drawn. *See, e.g.*, *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana Dep't of Health*, 64 F. Supp. 3d 1235, 1239-41 (S.D. Ind. 2014) (applying rational basis review in holding a statute unconstitutional that treated two groups of medication abortion providers, abortion clinics and physician's offices, differently violates equal protection). Indeed, under rational basis review, "courts examine, and sometimes reject, the rationale offered by the government for the challenged discrimination." *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014) (citing *Village of Willowbrook v. Olech*, 523 U.S. 562 (2000) (per curiam)). *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 626-35 (1996) (invalidating state constitutional amendment prohibiting governmental action to protect homosexual persons from discrimination because no rational basis supported the imposition of the special disability against one class of persons); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447-50 (1985)

30

(invalidating zoning ordinance that excluded a group home for persons with intellectual disabilities because there was no rational basis to believe that the group home would pose any special threat to the city's legitimate interests); *Plyler v. Doe*, 457 U.S. 202, 223-30 (1982) (invalidating statute withholding state educational funding for undocumented children because it is not rational to impute a parent's misdeeds to his or her child); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533-38 (1973) (invalidating a statute denying food stamp benefits to households with unrelated persons because, *inter alia*, it was not rationally related to the ostensible purpose of preventing fraud).

Here the Enrolled Act violates equal protection by imposing on persons different reporting requirements based on whether the "complication" arises after an abortion or other medical procedure, ignoring the fact that many of the complications listed in the Act are much more likely to occur after other medical procedures, procedures that are much more dangerous and are much more likely to produce far more severe consequences than abortions. To the extent that the State is interested in public health it is utterly irrational to ignore non-abortion procedures that are much more likely to injure the public health than abortions.[16]

In *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013), the Seventh Circuit considered the constitutionality of a statute that prevented physicians

---

[16]   This lack of equal treatment does not just concern other medical procedures aside from abortion. "Indeed, considering that it is well-established that the risks associated with pregnancy and childbirth are significantly greater than those associated with abortion, I would expect that if Indiana's goal were actually to improve public health, it would also (or alternatively) require the reporting of information on 'pregnancy complications.'" (Holmquist ¶ 30).

from performing abortions unless they possessed admitting privileges at a hospital no more than 30 miles away.  *Id.* at 787. Although the court did not resolve the issue on equal protection grounds, it noted that

> [a]n issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications. The rate of complications resulting in hospitalization from colonoscopies, for example, appears to be three to six times the rate of complications from abortions.

*Id.* at 790.  The State is similarly indifferent here, highlighting the irrationality of the statute.

This lack of rationality is even more apparent from the fact that, up until this statute, the State of Indiana had seen fit to impose the identical requirements concerning the reporting of extremely serious consequences on hospitals, ambulatory surgical centers and abortion clinics. 410 IAC 15-1.4-2-2 (hospitals); 410 IAC 15-2.4-2-2 (ambulatory outpatient surgical centers); 410 IAC 26-6-2 (abortion clinics).  At least from 2006-2016 no such consequences have been reported for abortion clinics, although they have for both hospitals and ambulatory surgical centers. This highlights the irrationality on imposing these new requirements only on persons faced with "abortion complications." The Enrolled Act violates equal protection.

## II.    The other requirements for the grant of a preliminary injunction are met here

### A.    PPINK is facing irreparable harm for which there is no adequate remedy at law

Absent a preliminary injunction, PPINK will suffer a denial of its constitutional rights and its employees will face harm.  It is well-established that the denial of

constitutional rights is irreparable harm in and of itself. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g., Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that a violation of constitutional rights constitutes irreparable harm as a matter of law."). Here PPINK is facing the denial of its constitutional rights. This is irreparable harm for which there is no remedy at law.

### B.     The balance of harms favors the issuance of a preliminary injunction

"The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) (internal citation omitted). PPINK will prevail on the merits of its claim here so there is no need to further address the balance, which, at any rate, clearly tips strongly in its favor. Enjoining the challenged provision and maintaining the status quo will not injure the State. A preliminary injunction merely requires the State to comply with the Constitution, which it cannot claim is harmful. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all").

### C.     The public interest also favors the grant of a preliminary injunction here

As Judge Pratt of this Court noted in granting a preliminary injunction against other Indiana abortion provisions, "the vindication of constitutional rights serves the

33

public interest." *Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner*, 194 F. Supp. 3d 818, 836 (S.D. Ind. 2016) (citing *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Preston v. Thompson,* 589 F.2d 300, 303 n.3 (7th Cir. 1978)). Thus, the public interest is served by the enforcement of the Constitution and by the grant of a preliminary injunction.

### D, The injunction should issue without bond

The issuance of a preliminary injunction will not impose any monetary injuries on the State. In the absence of such injuries, no bond should be required. *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

## Conclusion

Without a preliminary injunction, PPINK, on July 1, 2018, will be subject to unconstitutional statutory standards requiring it to report undetermined information to the State, subjecting it and its employees to serious punishment if they fail in their vague, uncertain, and irrational tasks. All of the prerequisites for the grant of a preliminary injunction are met and one should issue, without bond, enjoining the application of Indiana Code § 16-34-2-4,7 (eff. July 1, 2018).

s/ Kenneth J. Falk
Kenneth J. Falk
No. 6777-49

s/ Gavin M. Rose
Gavin M. Rose
No. 26565-53

s/ Jan P. Mensz
No. 33798-49

34

Jan P. Mensz
ACLU of Indiana
2457 E. Washington St.—Suite Z
Indianapolis, IN 46201
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org

Andrew Beck
Motion to Appear *Pro Hac Vice* to be filed
American Civil Liberties Union Foundation
125 Broad St.—18th Floor
New York, NY 10004
212/549-2641
abeck@aclu.org

Carrie Flaxman
Motion to Appear *Pro Hac Vice* filed
Planned Parenthood Federation of America
1100 Vermont Ave., NW, Suite 300
Washington, D.C. 20005
202/973-4830
carrie.flaxman@ppfa.org

Attorneys for Plaintiff

## Certificate of Service

I hereby certify that on this 18th day of May, 2018, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Thomas M. Fisher, Solicitor General
Julia C. Payne, Deputy Attorney General
Tom.Fisher@atg.in.gov
Julia.Payne@atg.in.gov

/s/ Kenneth J. Falk

Kenneth J. Falk
Attorney at Law