**EXHIBIT H**

DECLARATION OF CYNTHIA YEE-WALLACE
Case No. 1:18-cv-00319-DCN

MINUTES
# SENATE STATE AFFAIRS COMMITTEE

| | |
|---|---|
| **DATE:** | Monday, March 12, 2018 |
| **TIME:** | 8:00 A.M. |
| **PLACE:** | Room WW55 |
| **MEMBERS PRESENT:** | Chairman Siddoway, Vice Chairman Hagedorn, Senators Hill, Winder, Lodge, Vick, Anthon, Stennett, and Buckner-Webb |
| **ABSENT/ EXCUSED:** | None |
| **NOTE:** | The sign-in sheet, testimonies and other related materials will be retained with the minutes in the committee's office until the end of the session and will then be located on file with the minutes in the Legislative Services Library. |
| **CONVENED:** | **Chairman Siddoway** called the Senate State Affairs Committee (Committee) to order at 8:00 a.m. with a quorum present. |
| **MINUTES APPROVAL:** | **Senator Stennett** moved to approve the minutes of February 12, 2018. **Vice Chairman Hagedorn** seconded the motion. The motion carried by **voice vote**. |
| | **Vice Chairman Hagedorn** moved to approve the minutes of February 21, 2018. **Senator Buckner-Webb** seconded the motion. The motion carried by **voice vote**. |
| | **Senator Hill** moved to approve the minutes of February 26, 2018. **Senator Vick** seconded the motion. The motion carried by **voice vote**. |
| | **Senator Lodge** moved to approve the minutes of March 7, 2018. **Senator Winder** seconded the motion. The motion carried by **voice vote**. |
| **H 638 CONTINUED** | **RELATING TO THE ABORTION COMPLICATIONS REPORTING ACT to require reporting of health complications related to abortions to the Idaho Department of Health and Welfare.** |
| | **Chairman Siddoway** explained discussion would continue from the previous Committee meeting regarding **H 638**, reporting complications associated with abortions. He welcomed David Ripley. |
| | **David Ripley**, Executive Director, Idaho Chooses Life, thanked Representative Chaney and Senator Martin for their leadership on this bill. He named other organizations that were instrumental in shaping **H 638** and have shown support throughout the process. |
| | **Mr. Ripley** said he heard Idaho does not need this legislation because Idaho already has a reporting system. Abortion practitioners are required to report abortions they perform to the Idaho Department of Health & Welfare (IDHF). That law was enacted in 1977. Nowhere does the law require that complications to an abortion be reported – by the abortion practitioners or anyone that may treat such complications. IDHF included a table in its Annual Report reporting 9 complications out of 1289 abortions in 2016.**Mr. Ripley** stated his belief that this number is grossly misleading for the following reasons: 1.) IDHF does not have the statutory authority to require the disclosure of complications; Idaho Code § 39-261 does not mention complications; and 2.) Idaho Code § 39-261 is directed solely at abortion – most complications are not going to take place in the abortion practitioner's office, especially in this age of chemical abortions which are, in part, carried out at home. |

In answer to Senator Winder's question regarding the collection of data, **Mr. Ripley** stated Idaho already collects extensive demographic data from abortion practitioners on women undergoing abortions. This has been ongoing since 1977 without legal challenge. **Mr. Ripley** referred to the loss of a ban on telemedicine abortions in federal court for lack of hard evidence that there are health risks associated with abortion. The only data available was from the Federal Drug Administration for the year 2011. This, or similar, legislation has been enacted by 12 states: Arizona, Nebraska, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Wisconsin, Wyoming, Louisiana, Mississippi, and Missouri. **H 638** has been modified due to work with the Idaho Medical Association (IMA) and the Idaho Hospital Association (IHA).

In response to a question regarding confidentiality, **Mr. Ripley** maintained this legislation would protect the anonymity of the woman. He stated tracking any particular woman's medical history will not be possible. Under this legislation, IDHF would only be responsible for managing and reporting the data. The Attorney General's Office did not raise an issue with this provision.

**Mr. Ripley** addressed other aspects of the bill (Attachment 1). He asked for the Committees' support for what he viewed as a landmark bill.

**Senator Buckner-Webb** asked if there were other post-medical procedures that require this type of reporting. **Mr. Ripley** was not aware of any. **Senator Buckner-Webb** asked if Mr. Ripley had consulted with medical professionals outside the group he is representing about their responses to this kind of reporting requirement on behalf of their patients. **Mr. Ripley** responded they met with representatives of the IMA and addressed their concerns. There were also conversations with the Idaho State Board of Medicine and the IHA to address their concerns.

**Senator Buckner-Webb** inquired if Mr. Ripley would share some of their concerns. **Mr. Ripley** indicated one of the more substantial concerns of the IMA involved the original idea of tracking the financial costs associated with treatment of post-abortive complications; that section was removed from this bill. The IMA was concerned about a challenge for vagueness. As a result, the list of complications is extensive. Another concern from the medical community was that not all doctors agree all of the complications on the list are abortion related. **Mr. Ripley** elaborated on the link between abortion and breast cancer. The language was altered to reflect the best medical judgement of the individual doctor based upon his/her understanding of the issues.

**Kerry Uhlenkott**, Legislative Coordinator, Right to Life of Idaho, stated she is in support of **H 638**. **Ms. Uhlenkott** said, with his permission, she will read a synopsis of Dr. Randy O'Bannon's germane points about chemical abortion complications. He made these points when he testified in Idaho in 2015 to support the webcam ban legislation. Dr. O'Bannon is the Director of Education and Research at the National Right to Life Committee (Attachment 2). In closing, **Ms. Uhlenkott** stated accurate and comprehensive reporting of abortion complications will be a huge step in helping protect women's health, and asked the Committee to vote for **H 638**.

**Senator Stennett** asked, given that men and women could have all the potential ailments listed in the bill, if Ms. Uhlenkott was comfortable with only women being profiled as this bill indicates. **Ms. Uhlenkott** answered in the affirmative since abortions are primarily concerned with women.

**Senator Stennett** asked where this information will be compiled; she inquired as to what other states do with this information. **Ms. Uhlenkott** stated her understanding is other states compile the information through their health and welfare departments. **Senator Stennett** asked what they are doing with the information. **Ms. Uhlenkott**

stated she could not answer that question.

**Senator Buckner-Webb** asked if this legislation is the result of the outcome of the telemedicine bill. **Ms. Uhlenkott** answered chemical abortions account for about half of all abortions performed in Idaho as well as webcam abortions. This legislation would serve as a follow up to identify any complications from those chemical abortions.

**Senator Stennett** referred to page 6, line 37 of the bill regarding the Legislature's right of intervention by concurrent resolution. She stated this legislation has been vetted; does that mean it is not in conflict with federal law. **Ms. Uhlenkott** deferred that question to the sponsor.

**Mistie Tolman**, Legislative Director for Planned Parenthood Votes Idaho (PP), testified in oppostion to **H 638**. **Ms. Tolman** declared she was proud of the care PP consistently provides women, even in the face of accusations and threats. She referred to studies from scientific and medical journals indicating a vast amount of data regarding the high level of safety of abortions. **Ms. Tolman** named several organizations who provided this data.

**Ms. Tolman** stated PP follows rigorous medical standards and guidelines, and supports medical practices based on sound science and research. She asserted the reporting outlined in **H 638** is not representative of complication reporting for any other medical procedure. She emphasized such reporting should be collected through high-quality medical and social science research and peer-reviewed studies, not government forms. **Ms. Tolman** reported Idaho already requires reporting of serious complications resulting from abortion, and she discussed the complication and mortality rates compared to other medical procedures.

**Julie Lynde**, Policy Director, Family Policy Alliance of Idaho, testified in support of **H 638**. **Ms. Lynde** voiced concern for women who must confront the decision regarding an abortion. She perceived this reporting as being important to provide a better understanding of what can be expected, should they choose to have an abortion.

**Senator Stennett** inquired of Representative Chaney why he felt there would be minimal fiscal impact on the Idaho Department of Health and Welfare (IDHW). **Representative Chaney** replied the number reported was low, so there would be minimal fiscal impact. **Senator Stennett** referred to the increase in information the IDHW will be compiling, and she asked if they had been consulted regarding the fiscal impact. **Representative Chaney** answered the IDHW contacted him and advised they may need an additional FTP.

**Representative Chaney** reiterated this process is for data compilation, not a research study. He noted it would give public health officials additional information to consider in decision making regarding underserved populations, problematic providers, and problematic procedures. He emphasized that data is nonpartisan, with no anti- or pro-abortion stance.

Elyse Durand submitted written testimony in opposition to **H 638** (Attachment 3).

MOTION:  **Vice Chairman Hagedorn** moved to send **H 638** to the floor with a **do pass** recommendation. **Senator Vick** seconded the motion.

**Senator Stennett** declared **H 638** proposes requesting information not allowed by HIPAA like race, age, and country of residence. She expressed concern regarding the constitutionality of the bill, and stated she would not support it.

The motion passed by **voice vote**. **Senator Stennett** and **Senator Buckner-Webb** voted nay.

**RIPLEY REMARKS – SENATE STATE AFFAIRS COMM**

**HB 638**

**MARCH 12, 2018**

MR. CHAIRMAN, THANK YOU FOR GIVING US TIME WITH YOUR COMMITTEE TO DISCUSS THIS GROUND-BREAKING LEGISLATION.

WE'VE ALREADY HEARD A LOT ABOUT THIS PROPOSAL, AND I'D LIKE TO TAKE A MOMENT TO RESPOND TO SOME QUESTIONS – AND TO EMPHASIZE THE KEY REASONS WE URGENTLY NEED THIS REFORM ENACTED INTO LAW.

BUT FIRST – I'D LIKE TO THANK REP. CHANEY AND SEN. FRED MARTIN FOR THEIR LEADERSHIP ON THIS BILL. I'M ALSO THANKFUL FOR THE SUPPORT OF RIGHT TO LIFE, THE FAMILY RESEARCH COUNCIL … AMERICANS UNITED FOR LIFE … AND THE CO-SPONSORS. I MUST ALSO THANK THE ATTORNEY GENERAL'S OFFICE … AND THE GOOD FOLKS AT THE BOARD OF MEDICINE FOR THEIR INPUT.

YOU MAY HEAR THAT <u>WE DON'T NEED THIS</u> … BECAUSE IDAHO ALREADY HAS A REPORTING SYSTEM.

THAT IS NOT QUITE TRUE. TITLE 39, CHAPTER 2 OF IDAHO CODE DOES INDEED REQUIRE REPORTING <u>BY THE ABORTION INDUSTRY</u>. THEY ARE REQUIRED TO REPORT THE ABORTIONS THEY PERFORM TO THE DEPARTMENT OF HEALTH & WELFARE. THAT WAS ENACTED IN 1977.

BUT NO WHERE DOES IT REQUIRE ABORTIONISTS TO REPORT COMPLICATIONS – <u>LET ALONE ANYONE ELSE IN THE MEDICAL COMMUNITY</u>.

IT IS TRUE THAT THE DEPARTMENT'S <u>ANNUAL REPORT INCLUDES A TABLE</u> (PAGE 12) SHOWING THAT THERE WERE 9 "COMPLICATIONS" OUT OF 1289 ABORTIONS PERFORMED IN IDAHO DURING 2016. BUT THIS IS A GROSSLY MISLEADING NUMBER.

FIRST – WE DON'T BELIEVE THE DEPARTMENT PRESENTLY HAS THE STATUTORY AUTHORITY TO REQUIRE THE DISCLOSURE OF COMPLICATIONS.  39-261 DOES NOT MENTION "COMPLICATIONS".

SECOND – IDAHO CODE 39-261 IS DIRECTED SOLELY AT ABORTIONISTS.  ESPECIALLY IN THE AGE OF CHEMICAL ABORTIONS … IN WHICH THE GIRL OR WOMAN IS SENT HOME WITH A PILL TO PERFORM SELF-ABORTIONS … <u>MOST COMPLICATIONS ARE NOT GOING TO TAKE PLACE IN PLANNED PARENTHOOD OFFICES.</u>

THE DATA NOW BEING PROVIDED BY THE DEPARTMENT IN ITS ANNUAL REPORT ON COMPLICATIONS IS ACTUALLY WORSE THAN NO DATA AT ALL.  IT ALMOST CERTAINLY <u>UNDERSTATES</u> THE HEALTH PROBLEMS THAT WOMEN ARE EXPERIENCING.

IF I MAY … I'D LIKE TO DIGRESS FOR A MOMENT TO ADDRESS A CONCERN RAISED BY SENATOR WINDER ON FRIDAY.  HE ASKED IF THE COLLECTION OF DEMOGRAPHIC INFORMATION ABOUT FEMALE PATIENTS MIGHT POSE SOME SORT OF LEGAL PROBLEM FOR THE STATE.

FIRST – THE ATTORNEY GENERAL'S OFFICE HAS THOROUGHLY VETTED THIS LEGISLATION AND SEES NO CONSTITUTIONAL PROBLEMS.

SECOND – THE STATE OF IDAHO IS ALREADY COLLECTING EXTENSIVE DEMOGRAPHIC DATA FROM ABORTIONISTS ON WOMEN UNDERGOING ABORTIONS:

- COUNTY OF RESIDENCE, AS WELL AS COUNTY WHERE THE PROCEDURE TOOK PLACE;
- AGE OF THE WOMAN
- MARITAL STATUS
- PREVIOUS ABORTION HISTORY

- ETHNICITY AND RACE OF THE WOMAN RECEIVING AN ABORTION
- TYPE OF PROCEDURE USED
- GESTATIONAL AGE OF THE PREBORN CHILD
- PREVIOUS LIVE BIRTHS EXPERIENCED BY THE WOMAN

AND, IT HAS BEEN COLLECTING THAT INFORMATION PURSUANT TO IC 39-261 SINCE 1977 WITHOUT LEGAL CHALLENGE.

MR. CHAIRMAN, THIS LEGISLATION STARTED IN RESPONSE TO OUR LOSS OF THE BAN ON TELEMED ABORTIONS IN FEDERAL COURT A COUPLE OF YEARS AGO.

PART OF THE REASON WE LOST THAT LAWSUIT WAS FOR LACK OF HARD EVIDENCE THAT THERE ARE HEALTH RISKS ASSOCIATED WITH ABORTION. THE STATE HAD TO RELY ON DATA FROM THE FDA – WHICH HAS NOT PUBLISHED A REPORT SINCE 2011.

BUT AS I'VE DUG DEEPER INTO THIS MATTER, IT HAS BECOME RATHER SHOCKING TO ME THAT WE HAVE YET TO ADDRESS THIS WHOLE PROBLEM, SOME 45 YEARS INTO THE ROE ERA.  <u>THE ONLY DATA WE HAVE COMES FROM THE ABORTION INDUSTRY ITSELF.  EVERYTHING IS SHROUDED IN MYSTERY AND SILENCE.  WE MUST END THAT.</u>

WE SIMPLY CAN'T WAIT ON THE FEDERAL GOVERNMENT FOR INFORMATION ON HOW THE INGESTING OF POWERFUL DRUGS LIKE RU-486 ARE IMPACTING WOMEN'S HEALTH --  PARTICULARLY SINCE WE ARE NOW ONE OF ONLY TWO STATES ENGAGING IN THE EXPERIMENT OF TELE-MED ABORTIONS.

I WOULD ALSO POINT OUT, MR. CHAIRMAN, THAT THIS LEGISLATION – OR SOMETHING SIMILAR -- HAS BEEN ENACTED IN <u>TWELVE STATES</u> AS OF NOW:

- Arizona, Nebraska, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Wisconsin, Wyoming, Louisiana, Mississippi and Missouri.

THERE HAVE BEEN MODIFICATIONS TO THIS LEGISLATION AS A RESULT OF OUR WORK WITH THE IDAHO MEDICAL ASSOCIATION AND THE IDAHO HOSPITAL ASSOCIATION. WE HAVE RESPONDED TO THEIR CONCERNS – THE LATEST OF WHICH IS REMOVING LANGUAGE IN THE BILL WHICH WOULD REQUIRE KEEPING TRACK OF THE COSTS ASSOCIATED WITH ABORTION COMPLICATIONS. THE HOSPITALS TOLD US THAT WOULD BE TOO CUMBERSOME.

THERE ARE ACTUALLY VERY GOOD REASONS FOR LOOKING AT THE HARD DOLLAR IMPACTS ASSOCIATED WITH ABORTION – IT IS NOT SIMPLY A MATTER OF THE COST OF THE PROCEDURE ITSELF. THAT IS ESPECIALLY TRUE IN CASES WHERE A WOMAN OR GIRL IS RECEIVING SUBSEQUENT TREATMENT UNDER THE MEDICAID PROGRAM.

NEVERTHELESS, THE HOSPITAL ASSOCIATION TOLD US THAT KIND OF DATA WOULD BE HARD TO COLLECT, SO WE REMOVED THAT REQUIREMENT FROM THE BILL. IT IS MORE IMPORTANT TO BEGIN TRACKING THE HEALTH RISKS.

BUT PERHAPS WE CAN REVISIT THE QUESTION OF SUBSEQUENT TREATMENT COSTS AT SOME POINT IN THE FUTURE.

MR. CHAIRMAN, I WOULD LIKE TO ANTICIPATE A COUPLE OF OTHER POSSIBLE OBJECTIONS TO THIS LEGISLATION.

ONE ARGUMENT I'VE SEEN IS THAT THE DEPARTMENT WILL HAVE TROUBLE KEEPING THE WOMAN'S IDENTITY CONFIDENTIAL IF IT HAS TO TRACK THE TREATMENTS AN INDIVIDUAL WOMAN UNDERGOES AFTER AN ABORTION.

THIS REPRESENTS A MISREADING OF THE BILL AND THE ROLE OF THE DEPARTMENT.

AS REP. CHANEY EXPLAINED, THIS LEGISLATION GOES TO GREAT LENGTHS TO PROTECT THE ANONYMITY OF THE WOMAN.  AS A RESULT, THE DEPARTMENT WILL BE <u>UNABLE</u> TO TRACK THE MEDICAL HISTORY OF A PARTICULAR WOMAN.

DOWN THE ROAD, IT WILL BE IMPORTANT FOR THOSE OF US LOOKING AT THE DATA TO REMEMBER THAT WE WON'T BE ABLE TO TELL FOR CERTAIN WHETHER A SINGLE ABORTION PROCEDURE LED TO SEVERAL DIFFERENT HEALTH PROBLEMS – OR WHETHER FIVE SEPARATE WOMEN EXPERIENCED FIVE SEPARATE ADVERSE EVENTS.

THAT IS JUST THE PRICE WE WILL HAVE TO PAY IN ORDER TO PROTECT WOMEN AND THEIR CONFIDENTIALITY.

I'VE ALSO HEARD AN OBJECTION RAISED REGARDING THE DEPARTMENT'S INABILITY TO DETERMINE WHETHER A REPORTED HEALTH COMPLICATION IS THE RESULT OF AN ABORTION, OR SOME OTHER FACTOR – OR ONE OF MANY FACTORS PRODUCING A GIVEN HEALTH PROBLEM.

LET ME POINT OUT THAT <u>THE DEPARTMENT HAS NO ROLE WHATSOEVER</u> IN MAKING A DIAGNOSIS.  THAT ISSUE WAS PART OF OUR DISCUSSIONS WITH THE IMA.  ONLY LICENSED MEDICAL PROFESSIONALS CAN MAKE SUCH A DETERMINATAION – WITHIN THE SCOPE OF THEIR LICENSE.  THE DEPARTMENT HAS NO RESPONSIBILITY WHATSOEVER TO MAKE MEDICAL DETERMINATIONS, NOR IS IT QUALIFIED TO DO SO.

THEY ARE RESPONSIBLE FOR MANAGING AND REPORTING THE DATA ONLY.

I HAVE EVEN HEARD AN ARGUMENT THAT THIS NEW REPORTING SYSTEM MIGHT SOMEHOW DISCOURAGE WOMEN FROM SEEKING TREATMENT FOR ABORTION COMPLICATIONS.

WITH ALL DUE RESPECT – THIS IS A SPECIOUS ARGUMENT.  <u>THE PATIENT</u> HAS NO RESPONSIBILITIES WHATSOEVER UNDER THIS LEGISLATON.  THIS REPORTING

PROCEDURE HAPPENS ENTIRELY BEHIND THE SCENES. THE ONLY POSSIBLE IMPACT ON THE WOMAN INVOLVED WOULD BE THE GATHERING OF PERTINENT MEDICAL INFORMATION AND PATIENT HISTORY – WHICH <u>MUST</u> HAPPEN AS PART OF ANY RESPONSIBLE MEDICAL PRACTICE.

BEFORE CLOSING, MR. CHAIRMAN, I WOULD LIKE TO RESPOND TO ANOTHER QUESTION RAISED ON FRIDAY MORNING. THERE HAVE BEEN QUITE A FEW QUESTIONS COMING ABOUT THE SECTION OF THE BILL (39-9508; PAGE 6) WHICH PROVIDES A MECHANISM FOR THE LEGISLATURE TO INTERVENE IN A LAWSUIT IF THIS LAW IS CHALLENGED.

THIS IS FAIRLY INNOVATIVE LANGUAGE – THOUGH IT HAS BEEN USED IN OTHER STATES. THE WAY WE SEE THIS WORKING IS THAT IF A LAWSUIT IS FILED ... THE ATTORNEY GENERAL WOULD STILL PROVIDE THE STATE'S BASIC, FIRST-LINE DEFENSE.

<u>BUT IF THE LEGISLATURE FELT THAT ITS POLICY POSITION WAS NOT BEING ADEQUATELY DEFENDED BY THE EXECUTIVE BRANCH</u> – AS SOME OF US FELT ABOUT THE LAWSUIT AGAINST OUR BAN ON TELE-MED ABORTIONS – IT WOULD HAVE THE PEROGATIVE OF INTERVENING IN THE CASE TO AUGMENT THE STATE'S DEFENSE OF A GIVEN STATUTE OR POLICY.

IT DOES NOT <u>REQUIRE</u> INTERVENTION. IN FACT, IT WOULD TAKE A SPECIFIC LEGISLATIVE ACT TO AUTHORIZE THE INTERVENTION BY THE LEGISLATURE IN A GIVEN CASE. AND, AGAIN, THE ATTORNEY GENERAL'S OFFICE DID NOT RAISE A CONSTITUTIONAL ISSUE WITH THIS PROVISION.

I MUST ALSO MENTION THAT <u>I AM UNAWARE OF A SINGLE LAWSUIT</u> BROUGHT IN THE TWELVE STATES THAT HAVE CREATED SIMILAR REPORTING REQUIREMENTS.

LASTLY, THE LEGISLATIVE FINDINGS AT THE BEGINNING OF THIS BILL NICELY SUMMARIZE ALL OF THE JUSTIFICATIONS FOR APPROVING THIS LEGISLATION. I ASK COMMITTEE MEMBERS TO QUICKLY REVIEW THAT SECTION PRIOR TO A VOTE.

WITH THAT, MR. CHAIRMAN, I ASK THIS COMMITTEE'S SUPPORT FOR THIS LANDMARK LEGISLATION.

AGAIN ... THANK YOU FOR YOUR CONSIDERATION.

 

**RIGHT TO LIFE OF IDAHO**

1220 South Vista Avenue
Boise, ID 83705
(208) 367-9378

P.O. Box 7404
Boise, ID 83707

Mr. Chairman Members of the Committee

I am Kerry Uhlenkott. Legislative Coordinator for Right to Life of Idaho

We support House Bill 638. We commend David Ripley & Idaho Chooses Life and Rep Cheney for their work on behalf of this legislation.

With his permission I will be synopcizing some germane points about chemical abortion complications made by Dr. Randy O'Bannon Director of Education & Research at NRLC, when he testified here in 2015 in support of Web Cam Ban legislation.

Almost half of all the abortions being done in Idaho are chemical abortions. "From the beginning, the abortion industry has asserted that the chemical abortion drugs are both "safe and effective." But too many women have found out otherwise."

According to the 2011, FDA Report there have been over 2,200 cases of complications associated with the abortion drugs. These complications include hemorrhage, infection, cases of ectopic pregnancies & even death.

"It is not only women in the US who are suffering as a result of chemical abortion drugs, it has become a worldwide trend."

Some researchers believe that the over 2,200 complications number may be just the tip of the iceberg. Because the 2011 FDA Report was not a formal study conducted by the FDA. It was only

*Affiliated with the National Right to Life Committee*

a summary of complications that had been reported to them. One wonders, how many complications have actually gone unreported.

"We know that some in the abortion industry, have told women suffering complications to tell doctors in the Emergency Rooms or their own private doctors that they are having miscarriages; they tell the women the doctors can not tell the difference."

"If this happens these women won't show up in any "mortality statistics" if they die or "adverse event" reports associated with the abortion chemicals, but these women will be dead or injured just the same."

No one is saying that every woman who has a chemical abortion will suffer complications. "But the over 2200 women who did were, from all we know, in good or even perfect health before taking these abortifacients."

"The abortion industry may try to tell you that they have learned from their experience and that they have eliminated the problems, but women have continued to suffer and be injured and risk death after taking the abortion pills."

Accurate and comprehensive reporting of chemical abortion complications will be a huge step in helping to protect women's health.

Please vote for HB 638. Thank you!

\*With his permission I have resubmitted to you a copy of Dr. Randall O'Bannon's testimony which he presented in 2015 in support of the Web Cam Abortion Ban. Dr. O'Bannon is the Director of Research and Education for National Right to Life. He has been researching and writing on chemical abortion for over 20 years when RU-486 was first tested in the US.

The FDA on April 30, 2011 reported:

\* more than 2,200 reports of "adverse events" or complications (2,207)

\* more than 600 women (612) hospitalized,

\* more than 300 (339) requiring transfusions.

\* 256 women reported infections, with 48 of them classified as severe.

\* 58 cases of ectopic pregnancies, which the pills do not treat

Sometimes these complications prove deadly.

The FDA knew of at least 14 deaths associated with use of these drugs in the U.S. and at least five more in other countries.

Testimony of Randall K. O'Bannon, Ph.D.
Direction of Education & Research
National Right to Life
Idaho HB 154: Physician Physical Presence Women Protection Act of 2015

Good Morning, Chairman Loertscher, members of the House State Affairs Committee. I thank you for the opportunity to testify before you today.

I am Dr. Randall K. O'Bannon, the director of research and education for National Right to Life and I have been researching and writing on chemical abortion for over 20 years, from the time when RU-486 was first tested in the U.S. in 1994 to the advent of web-cam abortions in Iowa in 2008 and subsequent efforts of Planned Parenthood to expand their use to other states.

From the beginning, the abortion industry has asserted that these drugs are both "safe and effective." But too many women have found otherwise.

Let me read you the tally from a postmarketing summary on mifepristone published by the FDA on April 30, 2011.
* more than 2,200 reports of "adverse events" or complications (2,207)
* more than 600 women (612) hospitalized,
* more than 300 (339) requiring transfusions.
* 256 women reported infections, with 48 of them classified as severe.
* 58 cases of ectopic pregnancies, which the pills do not treat

Sometimes these complications prove deadly.

The FDA knew of at least 14 deaths associated with use of these drugs in the U.S. and at least five more in other countries.

Deadly infections killed more than half (8) of those who died in the U.S. Undiscovered ectopic pregnancies which ruptured killed two others. Women in other countries have bled to death.

They aren't identified by name in the FDA report, but we come up with names and details when we crossreference cases we've seen in the newspapers..

Brenda Vise was a 38 year old pharmaceutical executive from Chattanooga who died in 2001 after her ectopic pregnancy ruptured. Clinic technicians were unable to find the child on an ultrasound.

Vise's case shows that it is not enough just to have the equipment to date or locate a pregnancy, but that it is essential to have someone who has the training to read an ultrasound, to do a pelvic exam, a blood test, to recognize the signs of ectopic pregnancy which these drugs will not treat.

Rebecca Tell Berg, a Swedish sixteen year old, and Manon Jones, an 18 year old from Britain, both bled to death, in 2003 and 2005 respectively.

Everyone who chemically aborts bleeds, and not just a little. A woman aborting with mifepistone generally bleeds four times as much as a woman having a standard first trimester surgical abortion, and sometimes the bleeding goes on for days, or weeks. When the bleeding gets out of control, what a woman needs is not a phone or a webcam, but a doctor close by who can examine her, evaluate her condition, and provide emergency surgery if necessary.

In September of 2003, Holly Patterson went to her local Planned Parenthood, signed some forms, took mifepristone there at the clinic, and administered the misoprostol to herself days later. Even though she visited her local ER when cramps and bleeding became unbearable, once she told them she was having an abortion, they simply did a pelvic exam, gave her some pain meds and sent her home.

She was dead just a few days later. What doctors thought to be the side effects of the chemical abortion turned out to be signs of a massive reproductive infection.

There was a sudden rash of these rare clostridial infections once these abortion pills went on the market. Seemingly out of nowhere, several otherwise healthy women – Holly Patterson, Orianne Shevin. Chanelle Bryant. Vivian Tran – suddenly contracted this bacteria and died within about a week of their chemical abortions.

One of the major problems in all these cases is that the signs and symptoms of an ectopic pregnancy, of a hemorrhage, of a serious reproductive tract infection – that is, painful cramping, heavy bleeding, gastro-intestinal distress – also happen to be standard side effects of the chemical abortion process. They are signs that even a trained emergency room doctor might easily misinterpret.

Someone who has been trained in use of the drugs, who understands the chemical abortion process, who knows and has examined the patient, really needs to be on hand to manage the situation, not some night shift nurse in the E.R. and certainly not some lowly clinic administrator who has drawn the short straw and gotten weekend phone duty.

No one is saying that every woman dies. But these women who did were, from all we can gather, in good or even perfect health before taking these abortifacients. They were, we must assume, screened and counseled and given the correct pills, but things somehow went horribly wrong and the help they needed was neither close enough nor swift enough nor capable enough to save their lives.

The folks at Planned Parenthood and their allies in the abortion industry may try and tell you that they've learned from their experience, that they've modified their protocol, that they've eliminated the problems, but women have continued to be suffer and be injured and risk death after every government warning, every protocol adjustment, every new "innovation."

Web-cam abortions are their latest innovation, one that stands to increase Planned Parenthood's reach and its revenues, but does not promise to make women's lives any safer.

They claim high safety and efficacy rates with webcam abortions, but critical data is missing.

In Grossman's August 2011 study from the journal *Obstetrics & Gynecology*, 58 women, or 21% of telemedicine study participants were "lost to followup." Nearly four times that many, 207, the report says, "declined participation" in the study or were "not invited."

This is, in fact, one of the chief problems with web cam abortions – not the women who dutifully check in reporting they survived their chemical ordeals – but the ones who don't, those who disappear, who go through this arduous, dangerous, bloody process without ever meeting the doctor in person who is charged with their care.

Researchers would have you ignore these lost women and calculate safety and efficacy from only those women with whom they were able to follow up. That's part of how you get a 99% "success" rate. While possible that these lost women's cases were non-problematic, it is also possible that these women turned to their own personal physicians, or to a doctor in the E.R., to handle serious problems.

Whether these other doctors would have been prepared to handle abortion related complications, or whether they would have even been told the woman was dealing with complications of a chemical abortion, is an open question. Some promoters of abortion pills have told women to tell doctors they are having miscarriages, telling them the doctors can't tell the difference.

If so, they won't show up in any mortality rates or "adverse event" reports associated with the drugs, but they will be dead or injured just the same

Frankly, we at National Right to Life believe that both women and their unborn children would be better off if these drugs weren't sold in the U.S. at all. But if they are going to sold, the least we can do is to make sure that the mother's life isn't going to be put at further risk for the convenience and economic benefit of the abortionist.

Even in Grosssman's 2011 study touting women's 'satisfaction" with webcam abortions, a high percentage – 25% – still said they would have preferred being in the same room as the doctor.

Perhaps the industry considers a few ruptured ectopic pregancies, hemorrhaging patients, or life threatening infections as "statistically insignificant," as acceptable losses, as just the cost of doing business, but I don't think the rest of us do. Not when lives hang in the balance, not when this is an entirely elective procedure, not when we can put a doctor in the room to ensure a more responsible standard of care.

I urge you to pass HB 154. Protect women's health and make sure these doctors do their jobs.

Attachment 3 – March 12, 2018
H 638

Elyse Durand

My name is Elyse Durand, and I am representing myself. I am urging you to vote 'no' on House Bill 638. This bill is fundamentally unnecessary. Regardless of where you stand on abortions, you have to understand that they are one of the safest procedures. According to the Center for Disease Control, abortion procedures have over a 99% safety record. This means, that only .04% of the time, complications arise. Less than 1%. There is absolutely no need to waste funds scrutinizing abortion providers that have proven their ability to consistently provide safe and legal abortions.

Additionally, Idaho already requires abortion providers to report complications. In 2014, the state's *own data* reports only one complication. Why are we wasting our time and efforts further scrutinizing a safe and legal medical procedure? The language and stigma surrounding abortions already produces enough shame. This bill would make abortions out to be a medically dangerous and risky procedure. It just isn't.

Idaho has created many hurdles for women seeking safe and legal abortions. This regressive policy would force women to endure more governmental intrusion in her personal healthcare decisions. This politically-motivated bill goes far beyond what is required to improve public health. It is a waste of time, money, and resources for our state. Especially for a state that prides itself on its fiscally conservative policies, the willingness to justify spending funds on an unnecessary project is shameful.

Lastly, this bill seeks to criminalize and otherwise penalize reproductive healthcare providers from doing their jobs. I ask that you trust healthcare providers, and the evidence provided today, and vote no on HB 638.

March 12, 2018
H 638